**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| DOLORES GORSUCH, individually and as a representative of a class of similarly situated plaintiffs, | § § § § § | Case No.: _____ |
| Plaintiff, | § § | Judge: _____ |
| vs. | § § | **CLASS ACTION COMPLAINT WITH JURY DEMAND ENDORSED HEREON** |
| FINANCIAL FREEDOM, a division of ONEWEST BANK, FSB; FINANCIAL FREEDOM SENIOR FUNDING CORPORATION; FINANCIAL FREEDOM ACQUISITION, LLC; and ONEWEST BANK, FSB, | § § § § § § | Pamela A. Borgess (0072789) James G. O'Brien (0088460) **ZOLL, KRANZ & BORGESS, LLC** 6620 W. Central Ave., Suite 100 Toledo, OH 43617 |
| Defendants. | § § § § § § § § | Tel. (419) 841-9623 Fax: (419) 841-9719 Email: pamela@toledolaw.com Email: jim@toledolaw.com |
| | § § § § § § § § § § § | Stephen J. Fearon, Jr. (subject to PHV) Caitlin Duffy (subject to PHV) Michelle H. Quinn (subject to PHV) **SQUITIERI & FEARON, LLP** 32 East 57th Street, 12th Floor New York, New York 10022 Tel: (212) 421-6492 Fax: (212) 421-6553 Email: stephen@sfclasslaw.com Email: caitlin@sfclasslaw.com Email: michelle@sfclasslaw.com |
| | § § | *Counsel for Plaintiff and the proposed class* |

Plaintiff Dolores Gorsuch ("Plaintiff"), on behalf of herself and the class described below, brings the claims set forth below against Financial Freedom, a division of OneWest Bank, FSB ("FF"), Financial Freedom Senior Funding Corporation ("FFSFC"), Financial Freedom

Acquisition, LLC ("FFA") and OneWest Bank, FSB ("OneWest Bank") (collectively, "Financial Freedom" or "Defendants").

## NATURE OF THE ACTION

1.     Plaintiff and the other class members have or had loans or lines of credit owned, originated and/or serviced by Financial Freedom secured by their residential property. Throughout the Class Period, Financial Freedom has engaged in a scheme, pattern and practice of demanding that borrowers maintain flood insurance for their property in amounts greater than required by law, greater than required by their mortgage agreements, and greater than Financial Freedom's financial interest in their property, without any reasonable basis or justification.

2.     In the event that borrowers fail to maintain their flood insurance policies, rather than attempt to maintain delinquent borrowers' existing policies, Financial Freedom replaced borrowers' insurance policies with more expensive ones, known as "force-placed" or "lender-placed" insurance ("FPI" or "LPI") policies. Such policies provide less coverage and are substantially more costly than the borrowers' original policies, while providing lucrative financial benefits to Financial Freedom and its affiliates.

3.     Upon information and belief, Financial Freedom exploited its contractual authority to force-place insurance in order to reap additional and unjustified profits in the form of fees, commissions, rebates, ceded reinsurance premiums, and other forms of consideration at the expense of borrowers whose flood insurance was force-placed. These improper fees and charges were not legitimately related to the cost of the force-placed insurance or the purposes for which force-placed insurance is purchased: to protect the lender's interest in the property.

4.     Financial Freedom derives improper financial benefits by imposing force-placed flood

insurance policies on properties, some of which are already covered by insurance policies purchased by the homeowner. In addition, on information and belief, Financial Freedom charges residential borrowers for the "cost" of procuring force-placed insurance from insurance agents of Financial Freedom, but a portion of such "cost" is returned, transferred or paid to Financial Freedom and/or its related entities. Plaintiff seeks to recover damages equal to the amount of the improper and inequitable financial benefit received by Financial Freedom and/or its affiliates as a result of this anti-consumer practice, and to rescind the future collection of amounts charged against the mortgage accounts of residential borrowers but not yet collected.

5.       The premiums paid by and/or assessed to Plaintiff and members of the Class also included amounts not attributable to the cost of providing force-placed insurance but, instead, constituted expenses associated with servicing the loans. The small percentage of borrowers who paid for force-placed insurance were shouldering the costs of monitoring the entire loan portfolio—effectively providing kickbacks to Financial Freedom in the form of subsidies paid by borrowers whose insurance was force-placed. *See* Testimony of Birny Birnbaum on Behalf of the Center for Economic Justice for the Florida Office of Insurance Regulation dated July 3, 2012, attached hereto as Exhibit 1 ("Birnbaum Florida Testimony").

6.       As one journalist observed of the industry:

> In the pantheon of modern-day mortgage abuses, force-placed insurance hasn't attracted much attention. But it generates hundreds of millions of dollars a year in fees and commissions for insurance companies, banks and other financial institutions.
>
> Policies are sometimes backdated to cover periods that have already passed.  In essence, critics say, high-priced insurance policies cover a time when no events happened. And often, the mortgage company and the force-placed-insurance company are affiliated, with the mortgage company receiving a "service fee" in return for the business. But homeowners don't know that.

3

*See* Dave Lieber, *Everyone Profits Off Force-Placed Insurance, Except Homeowner*, Star Telegram (Oct. 1, 2011), attached hereto as Exhibit 2.

7.    Recently, regulatory authorities around the country have started to investigate the forced-placed insurance practices of lenders and servicers like Financial Freedom and insurance companies like Seattle Specialty Insurance Services, Inc. ("SSIS"). For Example, the New York State Department of Financial Services ("NYSDFS") convened hearings in 2012 to investigate the force-placed insurance industry. On the opening day of these hearings, NYSDFS Superintendent Benjamin Lawsky noted that his department's initial inquiry uncovered "serious concerns and red flags" which included: (a) exponentially higher premiums for force-placed insurance than regular insurance; (b) extraordinarily low loss ratios; (c) harm to distressed borrowers; (d) lack of competition in the market; (e) increased reliance on force-placed insurance as a major profit center for both banks and insurers; and (f) "tight relationships between banks, their subsidiaries and insurers." *See* Opening Statement of Benjamin M. Lawsky, Superintendent of Financial Services (May 17, 2012), attached hereto as Exhibit 3.

8.    As Superintendent Lawsky summarized:

> In some cases this takes the form of large commissions being paid by insurers to the banks for what appears to be very little work. In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies.  Thus, the banks pay high premiums for coverage that is highly profitable and then those big profits revert right back to the banks through reinsurance agreements.
> * * * *
> In sum, when you combine this close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions that we need to explore in these hearings.

*Id.* at page 3.

9.      These 2012 hearings investigated the FPI practices of banks and mortgage loan servicers like Financial Freedom and force placed insurance providers, including QBE Insurance Corporation ("QBE"), an insurance provider which acquired SSIS on or about September 1, 2010. *See Under Interrogation,* American Banker (Jan. 27, 2012), *available at* http://www.americanbanker.com/news/force-placed-insurance-subpoenas-1046159-1.html, attached hereto as Exhibit 4; Louise Story, *Big Banks Face Inquiry Over Home Insurance*, N.Y. Times (Jan. 10, 2012), *available at* http://www.nytimes.com/2012/01/11/business/big-banks-facing-inquiry-over-possible-insurance-fraud.html, attached hereto as Exhibit 5; Press Release, *QBE announces acquisition of Seattle Specialty Insurance Services, Inc.*, attached hereto as Exhibit 6.

10.     Consumer advocates at these hearings stated that FPI usually costs the borrower three to ten times the price of regular insurance and Mr. Lawsky noted that insurers paid an exceptionally low loss ratio: around less than 25 cents in claims for every dollar of premium they received. *See* Mary Williams Walsh, *New York Investigates Insurer Payments to Banks*, N.Y. Times (May 21, 2012), *available at* http://www.nytimes.com/2012/05/22/business/new-york-investigates-home-insurer-payments-to-banks.html, attached hereto as Exhibit 7.

11.     In response to these hearings, New York Governor Andrew M. Cuomo stated that his administration would continue to investigate the "lack of competition, high prices, and low loss ratios and take necessary steps to clean up this market." *Id.*

12.     In addition, the National Association of Insurance Commissioners ("NAIC")—the lead national insurance regulatory organization created and governed by the chief insurance regulators

from all 50 states that is charged with establishing standards and best practices, conducting peer reviews, and coordinating regulatory oversight—began investigating force-placed insurance practices and held public hearings on August 9, 2012 to look into the force-placed insurance practices of banks and their partners.  *See* Mark E. Ruquet, *NAIC Promises Greater Focus on Force-Placed Insurance as CFPB Proposes Rules*, PropertyCasualty360.Com (Aug. 10, 2012), attached hereto as Exhibit 8.

13.     Throughout the Class Period (defined below), Financial Freedom has engaged in unlawful, abusive and unfair practices with respect to force-placed insurance, including: (a) force-placing insurance on borrowers in breach of the contracts that Plaintiff and the Class had with their lenders; (b) force-placing insurance on borrowers in amounts that exceeded the limits imposed by the borrowers' loan documents and by law; (c) forcing borrowers to pay for duplicative insurance coverage; (d) improperly exploiting the ability to manage and gain access to lines of credit and/or escrow accounts in order to increase profits to Financial Freedom and to the insurance providers; (e) forcing excessive insurance on borrowers arranged through pre-designated providers of force-placed insurance at a substantially higher cost to the borrower; (f) charging Plaintiff and members of the Class unreasonably high amounts for force-placed insurance, inflated by unreasonable expenses unrelated to the provision of the insurance and which result from collusion among affiliates and/or providers involved in the process; (g) receiving fees, payments, commissions and other things of value from providers of force-placed insurance; (h) misrepresenting that Financial Freedom was force-placing flood insurance on Plaintiff's and Class members' properties to secure Financial Freedom's interests and omitting to inform Plaintiff and the Class members that Financial Freedom was force-placing flood insurance to generate an unreasonable and unwarranted profit for Financial Freedom; and (i)

conspiring to take advantage of their contractual authority to force-place flood insurance on Plaintiff and the Class members in order to return an undisclosed and improper financial benefit to Financial Freedom, its affiliates, and/or providers that it partnered with.

14.     Financial Freedom engaged in this conduct in bad faith, knowing that its actions were inconsistent with the contracts and mortgage documents, applicable law, reasonable commercial standards of fair dealing, and the reasonable expectations of borrowers upon originating their mortgages.

15.     Based on Financial Freedom's conduct as described herein, Plaintiff asserts claims for (a) violating the Truth-In-Lending Act ("TILA"); (b) breach of contract including breach of the covenant of good faith and fair dealing; (c) unjust enrichment; and (d) declaratory and injunctive relief.

16.     Plaintiff asserts these claims on behalf of herself and a class (the "Class") consisting of all persons who have or had a residential mortgage loan or line of credit owned, originated or serviced by Financial Freedom secured by property located in Ohio and, in connection therewith, were charged for "force-placed" flood insurance on the secured property within the applicable statute of limitations.

17.     Plaintiff and the Class seek injunctive relief, corresponding declaratory relief, monetary relief, and other appropriate relief for Financial Freedom's unlawful conduct, as described herein.

## **THE PARTIES**

18.     Plaintiff Dolores Gorsuch resides in Toledo, Ohio and is a member of the Class.

19.     Defendant Financial Freedom Senior Funding Corporation is a Delaware corporation

7

with its principal place of business in Irvine, California. Upon information and belief, FFSFC was a subsidiary of IndyMac Bank, FSB ("IndyMac"), and one of the largest reverse mortgage originators and servicers in the country. FFSFC does business in Ohio and throughout the country.

20.     On or about July 11, 2008, IndyMac Bank, FSB entered receivership and the Federal Deposit Insurance Corporation ("FDIC") acquired its subsidiaries including, but not limited to, FFSFC.

21.     Defendant OneWest Bank, FSB is a federal savings bank with its headquarters in Pasadena, California. OneWest Bank does business in Ohio and throughout the country.

22.     On or about March 19, 2009, OneWest Bank purchased IndyMac from the FDIC, including the mortgage loans and/or mortgage loan servicing rights of Plaintiff Gorsuch and other members of the Class which had previously been owned and/or serviced by IndyMac and/or its subsidiary, FFSFC.

23.     Defendant Financial Freedom, a division of OneWest Bank, FSB, is an originator and servicer of reverse mortgages with its headquarters in Phoenix, Arizona. It conducts business in Ohio and throughout the country. Upon information and belief, FF is a wholly owned subsidiary of OneWest Bank.

24.     Beginning on or about March 19, 2009 and throughout the relevant time period, FF's conduct was approved, authorized, or ratified by OneWest Bank.

25.     Defendant Financial Freedom Acquisition, LLC is a Delaware corporation with its principal place of business in Phoenix, Arizona. Upon information and belief, FFA is a wholly owned subsidiary of OneWest Bank.

26.     Upon information and belief, FFA is the current lender-in-interest to Plaintiff's mortgage.

8

27.     Beginning on or about March 19, 2009 and throughout the relevant time period, FFA's conduct was approved, authorized, or ratified by OneWest Bank.

28.     Upon information and belief, at all relevant times since at least March 19, 2009, FF has serviced Plaintiff's mortgage.

## JURISDICTION AND VENUE

29.     This Court has federal question jurisdiction over Plaintiff's TILA claim pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

30.     This Court also has original jurisdiction over this case under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2). Plaintiff is a citizen of Ohio and Defendants are citizens of different states. The amount in controversy in this action exceeds $5,000,000 and there are more than 100 members of the Class.

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Plaintiff resides in this District and Defendants regularly conduct business in this District.

## FACTUAL ALLEGATIONS

32.     If a borrower's home falls within a Special Flood Hazard Area ("SFHA"), federal law requires flood insurance on the home for the term of the mortgage loan "in an amount at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act, whichever is less." 42 U.S.C. § 4012a(b)(1) (emphasis added).

33.     As is typical of mortgages and consistent with this federal mandate, Financial Freedom requires borrowers to purchase and agree to maintain flood insurance coverage on their secured property, "to the extent required by the Secretary" of Housing and Urban Development

("HUD").

34.    HUD's website, in turn, limits the maximum amount of flood insurance to the outstanding principal balance of the loan, as follows:

> **Dollar Amount of Flood Insurance Coverage.**  For loans, loan insurance or guarantees, the amount of flood insurance coverage need not exceed the outstanding principal balance of the loan.

35.    In order to ensure that the mortgagee's interest in the secured property is protected, mortgage loan contracts typically allow the lender or third-party servicer to "force-place insurance" when the homeowner fails to maintain the insurance.  The amounts disbursed for the procurement of such insurance becomes additional debt secured by the mortgage.

36.    The authority afforded the lender or third-party servicer to force-place insurance is limited by the bounds of reasonable conduct, by the express terms of the mortgage itself and the applicable law. Financial Freedom routinely exceeds the bounds of reasonableness and the spirit, intent, and letter of the mortgage contract by force-placing insurance in a manner and in amounts that are not required to protect its interests in the property and not required by law and through other conduct described herein with respect to force-placing insurance.

37.    Plaintiff's and Class Members' mortgage agreements do not disclose the nature of the commissions, kickbacks, or reinsurance premiums that force-placed insurance providers funnel to Financial Freedom for providing the insurance. The mortgage agreements do not disclose that this payment will be based upon a percentage of the cost of the premium of the force-placed insurance. Instead, the contracts misrepresent to borrowers that the cost of the force-placed insurance is necessary in order to protect the value of and lender's interest in the secured property.

38.     Lender-placed or force-placed insurance policies are almost always more expensive than standard insurance coverage. Lender-placed policies can cost as much as ten times more than standard policies. While the force-placed insurance policy primarily benefits the lender, the excessive cost is passed on to the borrower. *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker, Nov. 10, 2010, 12:00 pm, *available at* http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1/html?zkPrintable=1&nopagination=1, attached hereto as Exhibit 9 ("Ties to Insurers").

**The Origination of Gorsuch's Reverse Mortgage**

39.     In or around 1987, Plaintiff bought a house at 4440 Grantley Road, Toledo, Ohio (the "Property") and obtained a mortgage to finance her home ("Initial Mortgage").

40.     In or around 1992, Plaintiff paid off her loan. Throughout the duration of Plaintiff's Initial Mortgage, Plaintiff was not required to purchase flood insurance.

41.     On or about December 7, 2007, Plaintiff obtained a Home Equity Conversion Mortgage reverse mortgage ("Reverse Mortgage") that was secured by her Property. The lender and servicer at the time was FFSFC. A copy of the Reverse Mortgage is attached hereto as Exhibit 10.

42.     In or around December 2007, Plaintiff's Property had an "Estimated Home Value" of approximately $120,000. *See* Reverse Mortgage Detailed Comparison, attached hereto as Exhibit 11.

43.     Upon information and belief, beginning in or around December 2007, the Estimated Home Value of Plaintiff's Property decreased.

44.     Beginning on or about December 7, 2007 until in or around June 2008, Financial Freedom did not require that Plaintiff obtain flood insurance.

45.     As detailed in paragraphs 2, 3 and 5 of Plaintiff's Reverse Mortgage:

>**2. Payment of Property Charges.** Borrower shall pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreements.
>
>**3. Fire, Flood, and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire.  This insurance shall be maintained in the amounts, to the extent and for the periods required by Lender or the Secretary of Housing and Urban Development ("Secretary"). Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary.  All insurance shall be carried with companies approved by Lender.  The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to Lender.
>\*       \*       \*
>**5. Charges to Borrower and Protection of Lender's Rights in the Property.** . . . If Borrower fails to make these payments or the property charges required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.
>To Protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities as defined in the Loan Agreement. Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

(emphasis added)

46.     Upon information and belief, the relevant terms of Plaintiff's Reverse Mortgage and the mortgages of Class members are substantially the same.

**Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers**

47.     Force-placed insurance programs have become a lucrative business for loan servicers and/or lenders. Commonly, the servicer and/or lender selects the provider through a pre-arranged agreement and force-places the policy in such a way as to receive an improper financial benefit. The servicer and/or lender benefits by placing the policy either: (a) with an affiliate; or (b) with a third party provider who has already agreed to share revenue with the lender and/or servicer in the form of a direct commission payment, subsidized portfolio monitoring and/or through "reinsurance" premiums that are ceded to a subsidiary/affiliate of the servicer (a "captive reinsurance arrangement").

48.     Under the direct payment arrangement, the provider of the force-placed insurance policy pays a portion of the premium collected either directly to the servicer or to a subsidiary posing as an insurance "agent" in the form of commissions or as a "reimbursement" of the servicer's "incurred expenses" related to force-placing the insurance.

49.     On information and belief, Financial Freedom has such an arrangement with SSIS and/or SSIS's affiliates and other insurers.

50.     Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring servicer. In return for the subsidiary's agreement to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums

13

received on account of the policy.

51.    Illustrative of the typical kickback arrangements is the following graphic from *American Banker*:



52.    J. Robert Hunter of the Consumer Federation described these practices in his testimony before the NYSDFS:

> In some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or brokers or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender-affiliated captive reinsurers. Lenders often receive free or below cost services from affiliated service providers.

*See* Hunter NYSDFS May 17, 2012 Testimony ("Hunter NYSDFS Testimony"), attached hereto

as Exhibit 12.

53.     Another experienced and noted expert in the area of force-placed insurance, Birny Birnbaum of the Center for Economic Justice, testified:

> Servicers have financial incentive to force-place the insurance because the premium includes commission and other consideration for the servicer. With some servicers, the insurance is reinsured through a captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement coverage.

*See* Birnbaum NYSDFS May 21, 2012 Testimony ("Birnbaum NYSDFS Testimony"), attached hereto as Exhibit 13.

54.     Borrowers have no say or input into the carrier or terms of the force-placed insurance policies. The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer.

55.     For their part, servicers have no incentive to comparison shop for the best rate. Rather, servicers are financially motivated to refer borrowers to the provider that will give the best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums. As the servicer's "commission" (*i.e.*, kickback) and/or reinsurance premium is usually related to the size of the policy, the servicer actually has an incentive to purchase the *highest* priced insurance, an interest diametrically opposed to that of the borrower.

56.     Commonly, a mortgage loan servicer enters into an agreement with an insurance provider pursuant to which it refers borrowers exclusively to the provider for force-placed insurance.

57.     Force-placed insurance policies are not underwritten on an individual policy basis. Rather, servicers' contracts with force-placed insurance providers such as SSIS or its subsidiaries

require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

58.     As J. Robert Hunter testified recently before the New York Financial Services Department, "[the] lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance." *See* Hunter NYSDFS Testimony, at 5 (Exhibit 12).

59.     Servicers often go so far as to actually outsource their insurance processing to the force-placed insurance provider. The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property. In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the servicer. Thus, where these servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral. *See* Ties to Insurers (Exhibit 9).

60.     While mortgage servicers and lenders like Financial Freedom profit greatly from force-placing insurance, on information and belief, they maintain a shroud of secrecy and do not separately report their income from payments received from providers of force-placed insurance. However, according to an article published by *American Banker*, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year." *See* Jeff Horowitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, American Banker (Mar. 10, 2011, 12:25PM) (http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-1034213-1.html) (noting that servicers demand generous commissions and other payments in return for their

16

referrals), attached hereto as Exhibit 14 ("Horowitz Article").

61.     "The incentives and potential for abuse in the administration of LPI [lender placed insurance] are great. Consumers do not request the insurance, but are forced to pay for it. The cost of LPI is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases; the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the servicer from the force-placement of the coverage." *See* July 28, 2011 Testimony of Birny Birnbaum, Executive Director of the Center for Economic Justice, Before the U.S. House of Representatives Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial Services, attached hereto as Exhibit 15.

62.     In addition, "[t]he prices for residential property LPI are significantly excessive. In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%. Incredibly, lenders get a commission – totaling hundreds of millions of dollars – out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral. The premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance – so the lenders' cost of tracking all loans is passed only to those consumers paying for force-place [sic] insurance." *Id*.

63.     Servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting. However, as *American Banker* noted:

> Though part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry – even after accounting for the generous commissions and other payments

17

that servicers demand.

*See* Horwitz Article (Exhibit 14).

64.  Direct "kickbacks" are also part of the process. "The insurance company that issued the [Homeowner's] new forced place insurance told ABC News that it generally pays Chase a 15 percent commission on such policies." Chris Cuomo and Gerry Wagschal, *Insurance Frustration: Family on Brink of Losing Home Get Mortgage Relief Following ABC News Report,* ABC News. Mar. 10, 2010, http://abcnews.go.com/TheLaw/abc-world-news-homeowners-angry-expensive-fixed-place-insurance/story?id=9919670, attached hereto as Exhibit 16.

65.  Servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property. However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting. *Id.*

66.  As Birny Birnbaum of the Center for Economic Justice testified, servicer explanations for the high cost of force-placed insurance are "unsupported by any evidence." Loss ratios have been historically low. *See* Birnbaum Florida Testimony (Exhibit 1).

**Financial Freedom's Force-Placed Insurance Operations**

67.  Upon information and belief, Financial Freedom is party to an agreement with SSIS and/or other insurance providers through which Financial Freedom receives payments for the referral of business through one or more of the arrangements described above, including through commissions paid to Financial Freedom.

68.  Upon information and belief, SSIS provided FPI policies on real estate located in Ohio and through the United States and had a non-competitive and exclusive relationship with Financial Freedom whereby both parties benefitted at the expense of the consumer by forcing

consumers to pay for high cost FPI policies which included premium costs not attributable to the insurance but rather costs of servicing the loan.

69.      The excessively inflated price of the SSIS policy did not represent the actual cost of providing the insurance, but instead represented the encompassed fees, commissions, "rebates" or (kickbacks) and other consideration for "faux" services purportedly provided by Financial Freedom and SSIS.

70.      Upon information and belief, Financial Freedom entered into exclusive purchasing agreements with SSIS pursuant to which Financial Freedom would act as the "broker" or "agent" for force-placed insurance policies purchased on behalf of Financial Freedom's borrowers and would receive a guaranteed commission equal to 10% to 20% of the premium for each policy.

71.      When SSIS provided flood insurance, Financial Freedom would either deduct the premiums from the borrower's escrow accounts or would add the premiums to the borrower's indebtedness and SSIS would then kick back a percentage of the premiums to Financial Freedom as a commission.

**Financial Freedom Charged Plaintiff for Force Placed Insurance Pursuant to Lucrative Pre-Arranged Agreements**

72.      On or about December 7, 2007, Plaintiff obtained a Reverse Mortgage from Financial Freedom secured by a mortgage on her Property and a line of credit for a total of approximately $65,864.39 ("Line of Credit") after her closing fees were paid. *See* Reverse Mortgage (Exhibit 10).

73.      In or around June 2008, Plaintiff was informed by her current homeowners insurance agent, Regan Insurance Agency ("Regan Insurance"), that Financial Freedom required Plaintiff to maintain flood insurance on her home. As a result, Plaintiff purchased the necessary flood

insurance on her own, at a total annual premium of approximately $600.

74.     Approximately six months later, Regan Insurance informed Plaintiff that Financial Freedom found her current flood insurance was deficient and that she was required by pay approximately an additional $200 to $300 for her flood insurance.

75.     Throughout the duration of her Reverse Mortgage until in or around October 2012, Plaintiff's flood insurance premiums were between approximately $800 and $1,200 per year.

76.     Until in or around October 2012, Financial Freedom periodically increased the amount of flood insurance Plaintiff was required to purchase.

77.     Upon information and belief, Plaintiff was informed by Regan Insurance that the amount required by Financial Freedom for flood insurance was based on replacement cost value.

78.     Beginning in or around 2012, as a result of paying her continuously increasing property charges, Plaintiff no longer had funds available in her Line of Credit.

79.     Upon information and belief, in or around August 2012, Financial Freedom sent Plaintiff a form letter informing her that her flood insurance coverage would expire in 45 days ("August 2012 Expiration Notice") and that if she did not renew her coverage, Financial Freedom would purchase coverage for her at her expense.

80.     Upon receipt of this letter, Plaintiff called Financial Freedom to explain that she was having trouble purchasing her own flood insurance for the entire year in one lump sum payment. In response, Financial Freedom informed her that she should either purchase her own flood insurance or Financial Freedom would purchase it for her and she could make monthly payments.

81.     On or about September 14, 2012, Financial Freedom sent Plaintiff a form letter ("September 2012 Repayment Agreement") informing her that:

> We have either (a) not received a response from you on the proposed Repayment Agreement we previously mailed to you; (b) not received your scheduled repayment; or (c) received notification that you have defaulted on your reverse mortgage loan due to another property tax, insurance premium, and/or homeowner's association dues delinquency (known as "property charges").

*See* September 2012 Repayment Agreement, attached hereto as Exhibit 17.

82.     The September 2012 Repayment Agreement also informed Plaintiff that:

> As stated in your reverse mortgage loan documents, you must pay your property charges timely. Your failure to do so has resulted in Financial Freedom advancing funds on your behalf, which must be repaid. The total repayment amount of $1791.30 is calculated based on the actual disbursement amount of property charges, less any available line of credit balance at the time of the disbursement(s) and any repayments received to date.

*Id.*

83.     Pursuant to the terms of Plaintiffs' Reverse Mortgage, property charges include "taxes, ground rents, <u>flood</u> and hazard insurance premiums…." *See* Reverse Mortgage ¶ 2 (Exhibit 10) (emphasis added).

84.     Instead of opting to continue Plaintiff's flood insurance, Financial Freedom force placed insurance on Plaintiff's Property, as part of Financial Freedom's FPI scheme described above at a premium of approximately $1,791.39 per year, far exceeding the prior premiums for flood insurance that Plaintiff purchased on her own.

85.     Financial Freedom's September 2012 Repayment Agreement was fraudulent, deceptive, and misleading because, upon information and belief, the "total repayment amount of $1791.30" was also calculated based on Financial Freedom's receipt of kickbacks and financial benefits pursuant to agreements with SSIS.

21

86.     Financial Freedom's September 2012 Repayment Agreement was also fraudulent, deceptive, and misleading because neither federal law nor Plaintiff's Reverse Mortgage require her to maintain flood insurance on her property in excess of her principal balance. The coverage was approximately $174,000 while the outstanding loan balance was only approximately $99,000.

87.     Conspicuously, Financial Freedom's September 2012 Repayment Agreement also omitted the relevant language of Plaintiff's Mortgage, which only requires her to maintain insurance "against loss by floods to the extent required by the Secretary."

88.     In or around 2012, Plaintiff's Property was appraised to be worth approximately $67,000.

89.     Beginning on or around October 15, 2012 until September 15, 2013 and as a result of receiving the September 2012 Repayment Agreement, Plaintiff paid Financial Freedom $149.29 per month ($1,792 per year) for the force placed insurance.

90.     Upon information and belief, the amount of coverage Financial Freedom force placed on Plaintiff's Property greatly exceeded Financial Freedom's interest in the Property, in that it exceeded the outstanding principal balance of the loan. The coverage was approximately $174,000 whereas the outstanding loan balance was only approximately $99,348.22.

91.     Upon information and belief, the amount of coverage Financial Freedom force placed on Plaintiff's Property exceeded the value of the Property.

92.     While Plaintiff's Reverse Mortgage, a standard form contract, allows the lender to pay for property insurance costs "to protect the value of the Property and Lender's rights in the Property", and to be reimbursed by the borrower, *see* Reverse Mortgage at ¶ 5 (Exhibit 10), the Reverse Mortgage does not authorize either the lender or the servicer to require the borrower to obtain flood insurance in excess of borrower's outstanding loan balance or in excess of the value

22

of the property. Nor does the Reverse Mortgage authorize either the lender or servicer to require the borrower to pay in excess of the net costs of those services in order for the lender and/or its affiliates to make a profit at the borrower's expense.

93.     On or about April 21, 2013, Financial Freedom sent Plaintiff a "Flood Insurance Renewal Notice" ("April 2013 Flood Insurance Renewal Notice") stating that the "flood insurance coverage which Financial Freedom, a division of OneWest Bank, FSB purchased on your behalf expires in 45 days" and informed Plaintiff that Financial Freedom's force placed insurance "will cover only the dwelling. The coverage will not protect your contents and may not protect your equity."

94.     The April 2013 Flood Insurance Renewal Notice further provided that:

> You are responsible for the cost of this insurance and the insurance charges for this coverage will be made from funds in your available line of credit and will be added to your outstanding loan balance. We and/or our affiliates may receive compensation in connection with the insurance coverage described in this letter.

95.     On or about June 12, 2013, Financial Freedom sent Plaintiff a letter ("June 2013 FPI Letter") to notify Plaintiff that Financial Freedom force placed flood insurance on Plaintiff's Property, effective June 5, 2013 through June 5, 2014, as part of Financial Freedom's FPI scheme described above, through SSIS, at a premium of approximately $1,790.52 per year, far in excess of the prior flood insurance premiums Plaintiff had paid  on her own. *See* June 2013 FPI Letter, attached hereto as Exhibit 18.

96.     The June 2013 FPI Letter stated:

> This letter is to inform you that coverage for flood insurance, which is required by your mortgage contract and the Flood Disaster Act of 1973, has been obtained on your mortgage property...Even though Financial Freedom, a division of

> OneWest Bank, FSB has advanced payment for this coverage, you are responsible for the cost of this insurance…This coverage is not homeowner insurance and it provides coverage for physical damage to the structure only.

*Id.*

97.     Financial Freedom's June 2013 FPI Letter was fraudulent, deceptive, and misleading because neither federal law nor Plaintiff's Reverse Mortgage require her to maintain flood insurance on her property in excess of her principal balance. Conspicuously, Financial Freedom's June 2013 FPI Letter also omitted the relevant language of Plaintiff's Mortgage, which only requires her to maintain insurance "against loss by floods to the extent required by the Secretary."

98.     The amount of coverage Financial Freedom force placed on Plaintiff's Property greatly exceeded Financial Freedom's interest in the Property, in that it exceeded the outstanding principal balance on the loan. The coverage was $180,000 whereas the outstanding loan balance was only approximately $101,862.51.

99.     While the premium for the force-placed insurance policy was substantially higher than a traditional insurance policy, the policy provided remarkably less coverage, in that it only covered the structure of the dwelling.

100.     Upon information and belief, the amount of coverage Financial Freedom force placed on Plaintiff's Property exceeded the value of the Property.

101.     While Plaintiff's Reverse Mortgage, a standard form contract, allows the lender to pay for property insurance costs "to protect the value of the Property and Lender's rights in the Property", and to be reimbursed by the borrower, *see* Reverse Mortgage at ¶ 5 (Exhibit 10), the Reverse Mortgage does not authorize either the lender or the servicer to require the borrower to

obtain flood insurance in excess of borrower's outstanding loan balance or in excess of the value of the property. Nor does the Reverse Mortgage authorize either the lender or servicer to require the borrower to pay in excess of the net costs of those services in order for the lender and/or its affiliates to make a profit at the borrower's expense.

102.   Financial Freedom knew or should have known that Plaintiff was not "required" to purchase flood insurance for her home in excess of the outstanding balance of her loan or in excess of the value of her Property, as evidenced by at least the following facts:

     a) the plain language of Plaintiff's Reverse Mortgage does not require flood insurance in excess of her principal balance or the value of her Property;

     b) the National Flood Insurance Act and its accompanying regulations do not require flood insurance in excess of a borrower's principal balance;

     c) HUD does not require flood insurance in excess of a borrower's principal balance;

     d) Financial Freedom did not require flood insurance in excess of Plaintiff's principal balance upon originating her mortgage; and,

     e) Financial Freedom's notices to Plaintiff misrepresented the terms of Plaintiff's Reverse Mortgage, and fraudulently omitted reference to the relevant language of her Reverse Mortgage, which only requires her to maintain insurance "against loss by floods to the extent required by the Secretary" of HUD.

103.   As a result of Financial Freedom's fraudulent and deceptive acts, Plaintiff and the Class have incurred unnecessary and excessive expenses for flood insurance. In addition, Financial Freedom has been unfairly, unjustly, and unlawfully enriched by the kickbacks, commissions, or other compensation that were paid in connection with such lender-placed flood insurance.

**Government Response to Mortgage Lender and Servicer Force-Placed Insurance Practices**

104.   Force-placed insurance practices of mortgage lenders and servicers, insurance providers

25

and insurance producers are currently the subject of a number of government investigations prompted by concerns that consumers are being gouged when they are force-placed in insurance following a lapse in their policies. See Under Interrogation, (Exhibit 4); Gretchen Morgenson, *Hazard Insurance With Its Own Perils*, NEW YORK TIMES (Jan. 21, 2012), attached hereto as Exhibit 19; see also Louise Story, *Big Banks Face Inquiry Over Home Insurance*, NEW YORK TIMES (Jan. 10, 2012) (Exhibit 5).

105.    State attorneys general are cognizant of and have taken action concerning servicers' abusive practices concerning force-placed insurance. Recently, a coalition of forty-nine state attorneys general entered into an historic joint state/federal settlement agreement with the country's five largest loan servicers ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis. *See* www.nationalmortgagesettlement.com/ (official website established by the government relating to the settlement); *see also* Jeff Horowitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, American Banker (Mar. 10, 2011, 12:25 PM) (http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-034213-1.html).

106.    Among other terms, the settlement essentially prohibits servicers from profiting from force-placed insurance. Specifically, under the settlement, mortgage servicers: (a) shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless of homeowner payment; and (e) must purchase the force-placed insurance for a commercially reasonable price. *Id.*; *see also*

Consent Judgment, *United States of America v. Bank of America Corp.*, Civ. No. 1:12-cv-00361-RMC (D.D.C. Apr. 14, 2012) (ECF No. 14 Section VII).

107.    Notably, state insurance commissioners and federal regulators have investigated and condemned captive reinsurance arrangements in the title insurance industry—which also had a relatively low level of losses—as nothing more than sham transactions designed to funnel unlawful kickbacks for business referrals. *See, e.g.*, Broderick Perkins, *Title Insurance Industry in Hot Water with Regulators Again*, SAN JOSE BUSINESS JOURNAL (May 22, 2005), available at http://www.bizjournals.com/sanjose/stores/2005/05/23/story4.html.

108.    Indeed, while announcing a $37.8 million settlement with nine title insurers, then Florida Insurance Commissioner John Garamendi stated, "This reinsurance scheme appears to be nothing more than a form of commercial bribery." As a result, a number of providers have abandoned such arrangements altogether. *See* Press Release, Florida Department of Insurance (July 20, 2005), available at http://www.departmentofinsurance.ca.gov/0400-news/0100-press-releases/0080-2005/release069-05.cfm.

109.    Fannie Mae has changed its policies so as to curb banks' and servicers' improper practices. Fannie Mae issued a Service Guide Announcement on March 14, 2012, "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements, and allowable reimbursable expenses for lender-placed insurance" for servicers of the loans it holds. The Fannie Mae guidelines seek to eliminate the abuses prevalent in the force-placed insurance industry including requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude: (1) any lender-placed insurance commission earned on that policy by the servicer or any related entity; (2) costs associated with insurance tracking or administration; (3) or any other costs beyond the actual

27

cost of the lender-placed insurance policy premium. *See* Fannie Mae Servicing Guide Announcement SVC-2012-04, attached hereto as Exhibit 20.

110.    The New York State Department of Financial Services' hearings on force-placed insurance resulted in government action and findings that borrowers were overcharged for force-placed insurance. On June 12, 2012, Governor Cuomo's website announced, "DFS Investigation Indicates Insurance Companies Overcharged for Force-Placed Insurance." It stated:

> The evidence of higher than necessary insurance premiums was made clear at a recent DFS hearing. Also, DFS discovered that the force-placed insurance market lacks the sort of competition that would keep premiums down. In New York, two companies have 90 percent of the market. In addition, the hearings made clear that high force-placed insurance costs are having a terrible impact on homeowners, while banks and insurers are profiting off the payments.

Available at http://www.governor.ny.gov/press/06122012DFS, attached hereto as Exhibit 21.

111.    The relatively low level of losses associated with force-placed insurance indicates that reinsurance with captives is also unnecessary. For example, during 2009, one insurer collected approximately $2.7 billion of premiums through its Specialty Insurance Division, which is overwhelmingly devoted to force-placed insurance. Notably, this insurer paid out only 36% of this amount in claims, though in the company's other lines of business a 70% claims-to-premiums ratio is the norm. Not surprisingly, far from being an excessive risk, force-placed insurance is actually this insurer's most profitable product. *Id.* In his testimony before the New York Attorney General, J. Robert Hunter presented statistics collected by the NAIC reflecting nationwide loss ratios for lender-placed insurance during the 2004–2011 period as being, on average, more than thirty-five points lower than the ratios for commercially available homeowners policies. *See* Hunter NYSDFS Testimony at 9 (Exhibit 12). When confined to the

28

period from 2007-2011, the disparity between lender-placed insurance loss ratios and those of commercially available homeowners policies was nearly 42 points. *Id.*

112.    On or about April 18, 2013, Governor Cuomo announced that a NYSDFS investigation produced a New York settlement with QBE, an owner of SSIS. *See* April 18, 2013 Press Release, attached hereto as Exhibit 22. The NYSDFS' investigation revealed that:

> QBE competed for business from the banks and mortgage servicers through what is known as "reverse competition." That is, rather than competing by offering lower prices, the insurers competed by offering what is effectively a share in the profits. This profit sharing pushed up the price of force-placed insurance by creating incentives for banks and mortgage servicers to buy force-placed insurance with high premiums. That's because the higher the premiums, the more that the insurers paid to the banks.
>
> In some cases, QBE paid commissions to insurance agencies and brokers that are affiliates of mortgage servicers. Typically the commissions are ten to twenty percent of the premium written on the servicer's mortgage loan portfolio. The evidence from the investigation indicates that the affiliated agencies and brokers do little to no work for the commissions QBE had paid them.

*Id.*

### Financial Freedom's Force Placed Insurance Policies and Practices Provide Unearned and Unjustified Profits and Kickbacks To Financial Freedom

113.    As *American Banker* observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business." Ties to Insurers (Exhibit 9). These costs are ultimately paid by the borrowers.

114.    Indeed, industry analysts have opined that referral fees, commissions and other payments

to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher, implying paydays for servicers amounting to hundreds of millions of dollars per year. *See* Birnbaum Florida Testimony (Exhibit 1).

115.    Moreover, on information and belief, the charges that Financial Freedom chose to impose upon borrowers for force-placed insurance also unlawfully included the cost of portfolio monitoring and tracking services for Financial Freedom's entire loan portfolio, the cost of which was then passed onto the small percentage of borrowers whose properties were force placed. *See Id*.

116.    Unjustified fees which amount to kickbacks also inflate the premiums of force placed insurance:

> The classic role of the insurance producer is to help the policyholder determine her insurance needs and shop the market for the insurance product that meets the policyholder's needs while seeking the most competitive price for the product. Such activities simply do not exist in [FPI] because there are only two national providers of the necessary package of insurance and related services and there is no price competition among the insurers. Soliciting new business consists of asking typically two venders for proposals – and such activity is a rare event for most servicers.

*Id.*

117.    Financial Freedom's practices of unlawfully profiting from force placing insurance policies tend to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks. Amounts paid to servicers and their affiliates as commissions and reinsurance premiums have become a part of the cost of doing business for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of

such kickbacks—to the detriment of consumers.

118.     Financial Freedom's conduct has threatened and, indeed, stifled competition. As the NAIC recently opined when asked whether pricing in the area of force-placed insurance is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects bank's interests or one where they are provided with an incentive or inducement to enter into the transaction." Ties to Insurers (Exhibit 9).

## CLASS ACTION ALLEGATIONS

119.     Plaintiff asserts her claims on behalf of the following proposed Class:

> All persons who have or had a residential mortgage loan or line of credit owned, originated or serviced by Financial Freedom secured by property located in Ohio and, in connection therewith, were charged for "force-placed" flood insurance on the secured property within the applicable statute of limitations. The Class excludes any judge or magistrate assigned to this case, Financial Freedom and any entity in which Financial Freedom has a controlling interest, and their officers, directors, legal representatives, successors and assigns.

120.     <u>Numerosity:</u> The Class is so numerous that joinder of all Class members is impracticable. The Class includes hundreds, and likely thousands, of Financial Freedom's customers.

121.     <u>Typicality:</u> Plaintiff's claims are typical of the members of the proposed Class.

122.     <u>Adequacy:</u> Plaintiff will fairly and adequately protect the interests of the Class, and has retained counsel experienced in complex class action litigation. Plaintiff has no interests which are adverse to those of the Class that they seek to represent.

123.     <u>Commonality:</u> Common questions of law and fact exist as to all members of the Class

31

and predominate over any questions solely affecting individual members of the Class, including:

(a)    Whether federal law requires Financial Freedom's customers to purchase and maintain flood insurance in amounts greater than necessary to secure their outstanding principal balance;

(b)    Whether the mortgage documents relied upon by Financial Freedom authorized Financial Freedom to demand and/or force-place flood insurance in amounts greater than necessary to secure the amounts of funds borrowed;

(c)    Whether Financial Freedom's form letters to borrowers misrepresent applicable flood insurance requirements;

(d)    Whether Financial Freedom maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

(e)    Whether Financial Freedom or its subsidiaries or affiliates received commissions or any other payments or things of value from force-placed insurance providers;

(f)    Whether Financial Freedom or its subsidiaries or affiliates participated in arrangements that involved kickbacks;

(g)    Whether Financial Freedom or its subsidiaries or affiliates received reinsurance premium payments from force-placed insurance providers;

(h)    Whether Financial Freedom or its subsidiaries or affiliates received financial benefits from the force-placed insurance providers in the form of insurance monitoring, tracking and processing services;

(i)    Whether Financial Freedom's force-placed insurance policies were provided by an affiliated entity;

32

(j)      Whether Financial Freedom received unauthorized and illicit payments in connection with force-placed insurance that were unrelated to a *bona fide* service in connection with the force-placed insurance and its purpose;

(k)      Whether Financial Freedom received payments in connection with force-placed insurance that exceeded the value of any services actually performed or that were otherwise commercially unreasonable;

(l)      Whether Financial Freedom required unnecessary force-placed insurance;

(m)      Whether FFA's and OneWest Bank's conduct constituted a violation of TILA;

(n)      Whether Financial Freedom breached the implied covenant of good faith and fair dealing in Plaintiff's and members of the Classes' mortgages or loan contracts;

(o)      Whether Financial Freedom breached the terms of Plaintiff's and members of the Classes' mortgages or loan contracts;

(p)      Whether Financial Freedom has been unjustly enriched;

(q)      Whether Financial Freedom is liable to Plaintiff and the Class for damages and, if so, the measure of such damages; and

(r)      Whether Plaintiff and the Class are entitled to declaratory, injunctive, and other equitable relief.

124.   These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

125.   Plaintiff is a member of the Class and will fairly and adequately represent and protect the interests of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has

33

retained counsel competent and experienced in complex nationwide class actions, including all aspects of this litigation. Plaintiff's counsel will fairly, adequately, and vigorously protect the interests of the Class.

126.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Financial Freedom.

127.    Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

128.    Class action status is also warranted under Rule 23(b)(2) because Financial Freedom has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

129.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

130.    Plaintiff reserves his right to modify or amend the definition of the proposed Class at any time before the Class is certified by the Court.

**FIRST CLAIM FOR RELIEF:**
**VIOLATION OF THE TRUTH IN LENDING ACT**
**(15 U.S.C. § 1601 *et seq.*)**
**(ASSERTED AGAINST FFA AND ONEWEST BANK)**

131.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

132.    Plaintiff brings this claim on behalf of herself and the proposed Class.

133.    Residential mortgage loan agreements between FFA, OneWest Bank and its customers are subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

134.    FFA and OneWest Bank are "creditors" as defined by TILA. Alternatively, FFA and OneWest Bank are the "assignees" of Plaintiff's note and mortgage as defined by 15 U.S.C. § 1641.

135.    FFA and OneWest Bank are required to clearly, conspicuously, and timely disclose all finance charges, other charges, and third-party charges that may be imposed in connection with a mortgage loan or line of credit. FFA and OneWest Bank are further required to accurately and fully disclose the terms of the legal obligation between the parties. *See* 12 C.F.R. § 226.17(c)(1) ("The disclosures shall reflect the terms of the legal obligation between the parties."). This duty to make truthful and accurate disclosures applies to disclosures at the time of the original transaction and to all later disclosures. *See Hubbard v. Fidelity Fed. Bank*, 91 F.3d 75, 79 & n.7 (9th Cir. 1996) (rejecting defendant's argument that 12 C.F.R. § 226.17(c) "only applies to disclosures before consummation of the transaction").

136.    FFA and OneWest Bank violated TILA by misrepresenting to Plaintiff and the Class that

35

force-placed insurance would only be obtained in the amount "necessary to protect the value of the Property and Lender's rights in the Property", and Plaintiff's mortgage does not authorize kickbacks or other compensation to FFA or OneWest Bank or its affiliates or subsidiaries for purchasing force-placed insurance.

137.     FFA and OneWest Bank were required to accurately and fully disclose the terms of the legal obligations between the parties. 12 C.F.R. § 226.17(c).

138.     FFA and OneWest Bank violated 12 C.F.R. § 226.17(c) by failing at all times to disclose the amount and nature of the "commission" FFA and OneWest Bank would receive for the purchase of force-placed insurance.

139.     FFA and OneWest Bank further violated TILA by misrepresenting to Plaintiff and the Class members that Plaintiff and the Class were required to purchase flood insurance in amounts greater than necessary to secure the amount of funds extended.

140.     When FFA and OneWest Bank added the force-placed premium charges to the outstanding principal amount of Plaintiff's loans, a new debt obligation was created. And, when it created this new debt obligation, FFA and OneWest Bank were required to provide new disclosures.

141.     12 C.F.R. § 226.18(d) requires disclosures of finance charges, which includes force-placed insurance premiums, including kickbacks under 12 C.F.R. § 226.4(b)(8). FFA and OneWest Bank failed to disclose the nature and amount of all finance charges associated with the force-placed insurance premiums it withdrew from Plaintiff's escrow account and/or added to their principal balance. This failure violated TILA.

142.     FFA and OneWest Bank force-placed Plaintiff into flood insurance and added these charges to Plaintiff's indebtedness. Those charges included kickbacks paid to FFA, OneWest

36

Bank or their affiliates or subsidiaries that were added to Plaintiff's mortgage in 2012 and 2013.

143.    To the extent that the violations described above occurred earlier, Plaintiff did not discover and did not have a reasonable opportunity to discover FFA's and OneWest Bank's fraud and nondisclosures because FFA and OneWest Bank concealed these violations.

144.    Plaintiff's TILA claims are timely. The statute of limitations on Plaintiff's TILA claim did not begin to run and/or was equitably tolled until Plaintiff had a reasonable opportunity to discover FFA's and OneWest Bank's TILA violations and complain about such violations.

145.    It would be manifestly unjust and inconsistent with the purposes of TILA to apply and enforce an earlier accrual date for Plaintiff's TILA claim.

146.    FFA and OneWest Bank systematically and pervasively engaged in similar violations of TILA to the detriment of other members of the Class.

147.    Plaintiff and the Class members have been injured and have suffered a monetary loss as a result of FFA's and OneWest Bank's violations of TILA.

148.    As a result of FFA's and OneWest Bank's violations, Plaintiff and the Class are entitled to recover actual damages and a penalty of $500,000 or 1% of FFA's and OneWest Bank's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

149.    Plaintiff and the Class also are entitled to recover attorneys' fees and costs from FFA and OneWest Bank, as provided by 15 U.S.C. § 1640(a)(3).

150.    In addition, Plaintiff and the Class are entitled to a declaration that FFA's and OneWest Bank's actions violate TILA, and corresponding injunctive relief enjoining FFA and OneWest Bank from engaging in further of such violations.

<u>SECOND CLAIM FOR RELIEF:</u>
**BREACH OF CONTRACT, INCLUDING IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(ASSERTED AGAINST ALL DEFENDANTS)**

151.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

152.    Financial Freedom is bound by the terms of Plaintiff's mortgage.

153.    Financial Freedom is a lender and has serviced loans governed by substantially similar standard form notes and mortgage contracts.

154.    Every contract contains an implied covenant of good faith and fair dealing.

155.    Financial Freedom acted on its own behalf and as the duly authorized agent of the owner or assignee of the mortgage agreements of Plaintiff and the members of the Class. Financial Freedom was contractually obligated to service the loans of Plaintiff and the members of the Class pursuant to the terms of their mortgage agreements and federal law.

156.    The mortgage contracts of Plaintiff and the members of the Class contained an implied covenant of good faith and fair dealing pursuant to which Financial Freedom was bound to exercise the discretion afforded it under the mortgage contract in good faith and to deal fairly with Plaintiff and the members of the Class in that regard. Financial Freedom is not allowed to evade the spirit of the mortgage contract by exercising the discretion afforded it under the mortgage to force place insurance in a manner abusive to borrowers.

157.    Any discretionary authority granted to Financial Freedom under the terms of Plaintiff's and the Class members' mortgage contracts was subject to Financial Freedom's implied duty of good faith and fair dealing. Accordingly, to the extent that the mortgage contracts of Plaintiff and the Class members permitted Financial Freedom to unilaterally "force-place" insurance,

Financial Freedom was obligated not to exercise its discretion to do so in bad faith for its own financial gain for the purposes of maximizing profits at borrowers' expense.

158.  Financial Freedom breached its duties of good faith and fair dealing in at least the following respects, among others:

(a)  Demanding and/or force-placing more flood insurance than required by federal law or the relevant loan and mortgage documents;

(b)  Misrepresenting the amount of flood insurance that Plaintiff and the other Class members were required to maintain on their property;

(c)  Imposing contractual requirements that did not exist or that exceeded the requirements disclosed in the relevant contracts;

(d)  Failing to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead—for the sole purpose of maximizing its own profits—forcing borrowers to pay for insurance policies from providers of Financial Freedom's choice. These policies needlessly came with substantially greater premiums and less coverage than borrowers' existing policies, while providing an improper financial benefit to Financial Freedom and/or its affiliates;

(e)  Using its discretion to choose a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations by purposefully forcing borrowers to pay for more than the cost of protecting the lender's interest in the secured property;

(f)  Failing to seek competitively priced insurance on the open market and instead selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies were continually purchased through

39

the same companies; and,

(g)     Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiff and the Class members and misrepresenting the reason for the cost of the policies.

159.    Further, to the extent that the mortgage contracts of Plaintiff and the Class permitted Financial Freedom to unilaterally "force-place" insurance, Financial Freedom was contractually permitted to do so only to the extent necessary to protect the value of the property and the mortgagee's interest in the secured property.

160.    The mortgage contracts of Plaintiff and the Class Members also do not require flood insurance in an amount greater than the unpaid principal balance on the loan.

161.    Nonetheless, Financial Freedom has imposed or collected amounts that exceeded or were unrelated to the amounts required to protect the value of the property and the mortgagee's interest in the property. Such practices have included, without limitation, requiring borrowers to pay for insurance coverage that exceeds or is unrelated to the amount necessary to protect the value of the property or mortgagee's interest in the secured property.

162.    Financial Freedom also imposed or collected amounts that were in excess of the principal balance of Plaintiff's and the Class Member's loans.

163.    By force-placing insurance that goes well beyond the pale of what is required by law or related to protecting its interests or the property value, Financial Freedom has breached express contractual obligations owed to Plaintiff and the members of the Class.

164.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing and the express terms of the mortgage contracts, Plaintiff and the members of the Class have suffered damages and are entitled to the relief sought herein for such

breaches of contract.

### THIRD CLAIM FOR RELIEF:
### UNJUST ENRICHMENT/DISGORGEMENT
### (ASSERTED AGAINST ALL DEFENDANTS)

165.    Plaintiff alleges this claim in the alternative.

166.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

167.    Financial Freedom and its affiliates have been unjustly enriched as a result of the conduct described in this Complaint and other inequitable conduct. The kickbacks, commissions and other compensation that Financial Freedom received in connection with force-placed insurance were not legitimately earned, and came at the ultimate expense of its customers who had insurance force-placed on them by Financial Freedom.

168.    Financial Freedom accepted and retained these payments under such circumstances that it would be inequitable for Financial Freedom to retain the benefit without payment to Plaintiff and the other Class members.

169.    Plaintiff and the Class members have conferred a substantial benefit upon Financial Freedom from the force-placed insurance premiums paid by Plaintiff and the Class members.

170.    As a result of Financial Freedom's unjust enrichment, Plaintiff and the Class members have sustained damages in an amount to be determined at trial and seek a full disgorgement and restitution of Financial Freedom's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above and throughout the Complaint.

### FOURTH CLAIM FOR RELIEF:
### DECLARATORY AND INJUNCTIVE RELIEF
### (ASSERTED AGAINST ALL DEFENDANTS)

171.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully

41

set forth herein.

172.     On each cause of action stated above, Plaintiff and the Class will be irreparably injured in the future by Financial Freedom's misconduct.

173.     Plaintiff, on behalf of herself and all members of the Class, seek a judgment declaring that Financial Freedom must cease the activities described herein, provide the Class with adequate remedies, including, without limitation, refunds and/or credits of all unfair, unlawful or otherwise improper force-placed insurance charges and provide for adequate procedures and policies to ensure that Financial Freedom's unlawful conduct does not continue. Such policies and procedures should include, without limitation, that Financial Freedom: (a) is prohibited from force-placing insurance when the servicer knows or has reason to know that the borrower has a policy in effect that meets the minimum requirement of the loan documents; (b) cannot force-place insurance that is in excess of the lender's interest in the mortgaged property; (c) is prohibited from purchasing the force-placed insurance from a subsidiary, affiliate, or any entity in which they have an ownership interest; (d) must make reasonable efforts to continue or reestablish the borrower's *existing* insurance policy if there is a lapse in payment; and (e) must purchase any force-placed insurance for a commercially reasonable price.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for relief as follows:

> A.  Determining that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure;
>
> B.  Designating Plaintiff as the Class representative;
>
> C.  Designating Plaintiff's counsel as counsel for the Class;

D. Issuing proper notice to the Class at Financial Freedom's expense;

E. Declaring that FFA's and OneWest Bank's conduct violated TILA;

F. Declaring that Financial Freedom's conduct as alleged herein breached the terms of the mortgage contracts and the implied covenant of good faith and fair dealing;

G. Declaring that Financial Freedom's conduct as alleged herein was inequitable and that Financial Freedom was unjustly enriched by their conduct;

H. Declaring that Financial Freedom acted willfully in deliberate or reckless disregard of applicable law and the rights of Plaintiff and the Class as alleged herein;

I. Awarding appropriate equitable relief, including restitution and an injunction requiring Financial Freedom to reverse all unlawful, unfair, or otherwise improper charges for flood insurance coverage, allowing customers to close loans without first paying premiums for flood insurance that were not necessary or required by law, prohibiting Financial Freedom from imposing unfair and unlawful hazard insurance requirements on borrowers, prohibiting Financial Freedom from earning commissions or other compensation for themselves or affiliated entities on force-placed flood insurance policies, and requiring Financial Freedom to cease and desist from engaging in further unlawful conduct in the future;

J. Awarding actual damages, statutory damages, punitive damages, and interest;

K. Awarding reasonable attorneys' fees and costs to the full extent permitted by law; and,

L.   Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

Dated: January 23, 2014

Respectfully submitted,

s/ Pamela A. Borgess
**ZOLL, KRANZ & BORGESS, LLP**
Pamela A. Borgess (0072789)
James G. O'Brien (0088460)
6620 W. Central Ave.
Suite 100
Toledo, OH 43617
Tel:     (419) 841-9623
Fax:     (419) 841-9717
Email: pamela@toledolaw.com
Email: jim@toledolaw.com

**SQUITIERI & FEARON, LLP**
Stephen J. Fearon, Jr. (subject to PHV)
Caitlin Duffy (subject to PHV)
Michelle H. Quinn (subject to PHV)
32 East 57th Street, 12th Floor
New York, New York 10022
Tel:     (212) 421-6492
Fax:     (212) 421-6553
Email: stephen@sfclasslaw.com
Email: caitlin@sfclasslaw.com
Email: michelle@sfclasslaw.com

*Counsel for Plaintiff and the proposed class*


## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Class demand a trial by jury.


s/ Pamela A. Borgess
Pamela A. Borgess (0072789)

44