REDACTED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| DOLORES GORSUCH, individuals and as a representative of a class of similarly situated borrowers,<br><br>          Plaintiff,<br><br>vs.<br><br>ONEWEST BANK, N.A.; FINANCIAL FREEDOM ACQUISITION, L.L.C.; BALBOA INSURANCE COMPANY; QBE INSURANCE CORPORATION; and NEWPORT MANAGEMENT CORPORATION,<br><br>          Defendants. | Civil Case No.:<br>3:14-cv-00152-JZ<br><br>**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Dolores Gorsuch ("Plaintiff"), on behalf of herself and as a representative of a class of similarly situated borrowers ("Class"), brings the claims set forth below against OneWest Bank, N.A. ("OneWest"), Financial Freedom Acquisition, L.L.C. ("Financial Freedom Acquisition"), Balboa Insurance Company ("Balboa"), QBE Insurance Corporation ("QBE"), and Newport Management Corporation ("Newport") (collectively, "Defendants").

## NATURE OF THE ACTION

1. Plaintiff and members of the Class (as defined below) have or had loans or lines of credit owned, originated, and/or serviced by OneWest secured by their residential property and were required to pay for "force-placed" insurance pursuant to exclusive agreements that return a financial benefit to OneWest unrelated to any contractual or other bona fide interest in protecting OneWest's interest in the loan, resulting in unauthorized and unfairly inflated costs to borrowers in violation of the law.

1

2.    In the event that borrowers fail to maintain their insurance policies, rather than attempt to maintain existing policies, OneWest replaces borrowers' insurance policies with "force-placed" or "lender-placed" insurance. Such policies offer less coverage, are substantially more expensive, and provide lucrative financial benefits to OneWest and its exclusive insurers.

3.    OneWest exploited its contractual authority to force-place insurance in order to reap additional profits in the form of unjustified commissions and other forms of consideration at the expense of borrowers whose insurance was force-placed. These improper fees and charges were not legitimately related to the cost of the force-placed insurance or the purposes for which force-placed insurance is purchased – to protect the lender's interest in the property.

4.    OneWest charges residential borrowers for the "cost" of procuring force-placed insurance, but a portion of this purported "cost" is returned, transferred or paid back to OneWest and/or its affiliated entities. Among other things, Plaintiff and members of the Class seek to recover treble damages under RICO, or, in the alternative, damages equal to the amount of the improper and inequitable financial benefit received by OneWest and/or its affiliates and OneWest's exclusive insurers as a result of this anti-consumer and predatory practice.

5.    The premiums paid by and/or assessed to Plaintiff and members of the Class also included amounts not attributable to the cost of providing force-placed insurance but, instead, constituted expenses associated with servicing the loans. The percentage of

REDACTED

borrowers who were charged for force-placed insurance were shouldering the costs of monitoring OneWest's entire loan portfolio – effectively providing kickbacks to OneWest in the form of below-market, outsourced insurance services.

6.    As one journalist observed of the industry:

> In the pantheon of modern-day mortgage abuses, force-placed insurance hasn't attracted much attention. But it generates hundreds of millions of dollars a year in fees and commissions for insurance companies, banks and other financial institutions.

> Policies are sometimes backdated to cover periods that have already passed. In essence, critics say, high-priced insurance policies cover a time when no events happened. And often, the mortgage company and the force-placed-insurance company are affiliated, with the mortgage company receiving a "service fee" in return for the business. But homeowners don't know that.

*See* Dave Lieber, *Everyone Profits Off Force-Placed Insurance, Except Homeowner*, Star Telegram (June 12, 2012), *available at* https://watchdognation.com/force-placed-insurance-mortgage/.

7.    Recently, regulatory authorities around the country have started to investigate the forced-placed insurance practices of lenders and servicers like OneWest and insurance companies like Balboa and QBE. For example, the New York State Department of Financial Services ("NYSDFS") convened hearings in 2012 to investigate the force-placed insurance industry. On the opening day of these hearings, NYSDFS Superintendent Benjamin Lawsky ("Superintendent Lawsky") noted that his department's initial inquiry uncovered "serious concerns and red flags" which included: (a)

3

REDACTED

exponentially higher premiums for force-placed insurance than regular insurance; (b) extraordinarily low loss ratios; (c) harm to distressed borrowers; (d) lack of competition in the market; (e) increased reliance on force-placed insurance as a major profit center for both banks and insurers; and (f) "tight relationships between banks, their subsidiaries and insurers." *See generally* Opening Statement of Benjamin M. Lawsky, Superintendent of Financial Services (May 17, 2012), attached hereto as Exhibit 1.

8. As Superintendent Lawsky summarized:

> In some cases this takes the form of large commissions being paid by insurers to the banks for what appears to be very little work. In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies. Thus, the banks pay high premiums for coverage that is highly profitable and then those big profits revert right back to the banks through reinsurance agreements.
>
> \* \* \* \*
>
> In sum, when you combine this close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions that we need to explore in these hearings.

*Id.* at page 3.

9. These 2012 hearings investigated the FPI practices of banks, mortgage loan servicers, and FPI providers including defendant QBE. *See Under Interrogation,* AM. BANKER (Jan. 27, 2012, 5:03pm ET), http://www.americanbanker.com/news/force-placed-insurance-subpoenas-1046159-1.html.

10. Consumer advocates at these hearings stated that FPI usually costs the

REDACTED

borrower three to ten times the price of regular insurance, and Mr. Lawsky noted that insurers paid an exceptionally low loss ratio of around less than 25 cents in claims for every dollar of premium they received. *See* Mary Williams Walsh, *New York Investigates Insurer Payments to Banks*, N.Y. TIMES (May 21, 2012), http://www.nytimes.com/2012/05/22/business/new-york-investigates-home-insurer-payments-to-banks.html;

11.  In response to these hearings, New York Governor Andrew M. Cuomo stated that his administration would continue to investigate the "lack of competition, high prices, and low loss ratios and take necessary steps to clean up this market." *Id.*

12.  In addition, the National Association of Insurance Commissioners ("NAIC") – the lead national insurance regulatory organization created and governed by the chief insurance regulators from all 50 states that is charged with establishing standards and best practices, conducting peer reviews, and coordinating regulatory oversight – began investigating force-placed insurance practices and held public hearings on August 9, 2012 to look into the force-placed insurance practices of banks and their partners. *See* Mark E. Ruquet, *NAIC Promises Greater Focus on Force-Placed Insurance as CFPB Proposes Rules*, PropertyCasualty360.com/2012/08/10/naic-promises-greater-focus-on-forc-placed-insura (Aug. 10, 2012).

13. Throughout the Class Period (defined below), Defendants have engaged in unlawful, abusive and unfair practices with respect to force-placed insurance, including: (a) improperly exploiting the ability to manage and gain access to lines of credit and/or

escrow accounts in order to exact payment for inflated force-placed insurance premiums that included unlawful kickbacks; (b) forcing insurance on borrowers arranged through pre-designated providers of force-placed insurance at a substantially higher cost to the borrower; (c) charging Plaintiff and members of the Class amounts for force-placed insurance, which were inflated by unreasonable expenses unrelated to the provision of the insurance and that result from collusion among affiliates and/or providers involved in the process; (d) receiving fees, payments, commissions and other things of value from providers of force-placed insurance; (e) misrepresenting that OneWest was force-placing insurance on Plaintiff's and Class members' properties to secure OneWest's interests and omitting to inform Plaintiff and Class members that OneWest was force-placing insurance to generate an unreasonable and unwarranted profit for OneWest and the other Defendants; and (f) conspiring to take advantage of their contractual authority to force-place insurance on Plaintiff and the Class members in order to return an undisclosed and improper financial benefit to Defendants.

14.  Based on Defendants' conduct as described herein, Plaintiff asserts claims for (a) a violation of the Racketeer Influenced Corrupt Organization Act, 18 U.S.C. §§ 1961-1968 ("RICO"); (b) Conspiracy to Violate RICO, 18 U.S.C. § 1962(d); (c) Unjust Enrichment against OneWest Bank and Financial Freedom Acquisition; and (d) Unjust Enrichment against Newport, Balboa, and QBE.

15.  Plaintiff asserts these claims on behalf of herself and a class (the "Class") consisting of all persons who have or had a residential mortgage loan or line of credit owned,

6

originated or serviced by OneWest secured by property located in United States and, in connection therewith, were charged for "force-placed" insurance on the secured property within the applicable statute of limitations.

16.   Plaintiff and the Class seek injunctive relief, corresponding declaratory relief, monetary relief, treble damages under RICO, and other appropriate relief for Defendants' unlawful conduct, as described herein.

## THE PARTIES

**A.    Plaintiff**

17. Plaintiff Dolores Gorsuch resides in Toledo, Ohio and is a member of the Class.

18. Plaintiff's mortgage and/or mortgage servicing rights are owned by Defendants and/or their affiliated entities. Defendants have force-placed insurance on Plaintiff's Toledo property three times, beginning in June 2012.

**B.    OneWest, Its Subsidiaries, and Affiliated Entities**

19. Defendant OneWest Bank, N.A. is a national bank with its headquarters in Pasadena, California. OneWest Bank began operations on March 19, 2009 after purchasing substantially all the assets of IndyMac Federal Bank, FSB ("IndyMac Federal Bank") from the Federal Deposit Insurance Corporation ("FDIC"). The FDIC had been acting as conservator of IndyMac Federal Bank after the Office of Thrift Supervision closed IndyMac Federal Bank's predecessor.

20.  In early 2014, OneWest converted its federal banking charter from a "federal

7

savings association" to a "national association." OneWest Bank conducts business in Ohio and throughout the United States and is the current lender-in-interest and servicer of Plaintiff's mortgage.

21. Defendant Financial Freedom Acquisition, L.L.C. is a Delaware corporation with its principal place of business in Pasadena, California. Financial Freedom Acquisition is a wholly owned subsidiary of OneWest and has been since the inception of OneWest's operations, March 19, 2009.

22. 

23. At all times relevant to this lawsuit, Financial Freedom Acquisition's conduct was approved, authorized, ratified, and/or directly controlled by OneWest.

24. Nonparty Financial Freedom, a division of OneWest Bank, N.A. ("Financial Freedom"), is the reverse mortgage division of OneWest and lists its address as a post-office box in Austin, Texas. It conducts business in Ohio and throughout the United States.

25.

26.  Nonparty <u>IndyMac Financial Services, Inc.</u> is a California Corporation with its principal place of business in Pasadena, California. At all times relevant to this lawsuit, IndyMac was a licensed insurance producer and a wholly owned subsidiary of OneWest Bank.

27. At all times relevant to this lawsuit, OneWest and/or Financial Freedom Acquisition directly controlled IndyMac's conduct through shared management, and OneWest and Financial Freedom Acquisition used IndyMac as the conduit through which OneWest's exclusive insurers funneled kickbacks and other unearned compensation to OneWest. In return for such kickbacks, OneWest's exclusive insurers secured the right to force-place insurance on OneWest's extensive loan portfolio for significantly inflated and noncompetitive premiums.

**C.**     <u>**Insurers and Their Subsidiaries**</u>

28.  Defendant <u>Newport Management Corporation</u> is a California corporation with its principal place of business in Irvine, California. It does business nationwide, including in Ohio. Before June 1, 2011, Newport was a wholly-owned subsidiary of Balboa. On or around June 1, 2011, Newport became a wholly-owned subsidiary of QBE First Insurance Agency, Inc. ("QBE First Insurance").

29. At all times relevant to this lawsuit, Newport's conduct was approved,

REDACTED

authorized, ratified, and/or directly controlled by Balboa or QBE related entities.





34. Defendant <u>Balboa Insurance Company</u> is a California corporation with its principal place of business in Irvine, California. Balboa is directly or indirectly wholly-owned by Bank of America Corporation. On or around June 1, 2011, QBE Insurance Group, Ltd ("QBE Insurance Group"), an Australian corporation with its principal place of business in Sydney, Australia, purchased a substantial portion of Balboa's assets, including the lender-placed insurance assets and liabilities of Balboa and its affiliated entities.

35.

36.

37. Nonparty Lexington Insurance Company ("Lexington") is a Delaware Corporation with its principal place of business in Boston, Massachusetts. Lexington is directly or indirectly wholly-owned by American International Group, Inc., otherwise known as AIG.

38.

39. Defendant QBE Insurance Corporation is a Pennsylvania corporation with its principal place of business in New York, New York that does business nationwide, including in Ohio. QBE is directly or indirectly a wholly-owned subsidiary of QBE Insurance Group.

40. Nonparty QBE Specialty Insurance Company ("QBE Specialty") is a North Dakota corporation with its principal place of business in New York, New York that does business nationwide, including in Ohio. QBE Specialty Insurance Company is a wholly-subsidiary of QBE Insurance Corporation.

41. Nonparty Seattle Specialty Insurance Company, Inc. ("Seattle Specialty") is a

Washington corporation with its principal place of business in Irvine, California that does business nationwide, including in Ohio. Seattle Specialty is a wholly-owned subsidiary of QBE Financial Institution Risk Services, Inc.

42. Nonparty Praetorian Insurance Company ("Praetorian") is an Illinois Corporation with its principal place of business in New York, New York. Praetorian is a wholly-owned subsidiary of QBE America's, Inc.

43.

44.

45.

13

## JURISDICTION AND VENUE

46. This Court has federal question jurisdiction over Plaintiff's RICO claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

47. This Court also has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Plaintiff is a citizen of Ohio and Defendants are citizens of different states. The amount in controversy in this action exceeds $5,000,000 and there are more than 100 members of the Class.

48. Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or transacts his affairs." Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a particular district, additional parties residing in other districts may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice require."

49. Alternatively, this Court has personal jurisdiction over Defendants because Defendants are engaged in systematic and continuous business activities in Ohio, have sufficient minimum contacts in Ohio, and/or otherwise intentionally avail themselves of the Ohio consumer market. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants appropriate under traditional notions of fair play and substantial justice.

50. Venue is proper in this District pursuant to 28 U.S.C. § 1391. Plaintiff resides

in this District, the property on which Defendants force-placed insurance is in this District, Defendants regularly conducts business in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

### A.    **Background**

51. As is typical of mortgagees, OneWest requires borrowers to purchase and agree to maintain insurance coverage on their secured property.

52. To ensure that the mortgagee's interest in the secured property is protected, mortgage loan contracts typically allow the lender or third-party servicer to "force-place insurance" when the homeowner fails to maintain the insurance. The amounts disbursed for the procurement of such insurance becomes additional debt secured by the mortgage.

53. Plaintiff's and Class members' mortgage agreements do not disclose the nature of the kickbacks that force-placed insurance providers funnel to OneWest for providing the insurance. The mortgage agreements do not disclose that this payment will be based upon a percentage of the cost of the premium of the force-placed insurance. Instead, the contracts and related notices misrepresent to borrowers that the cost of the force-placed insurance is necessary in order to protect the value of and lender's interest in the secured property.

54. Force-placed insurance policies are almost always more expensive than standard insurance coverage, often by as much as ten times. While the force-placed insurance policy primarily benefits the lender, the excessive cost is passed on to the borrower. *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More*

*Trouble*, American Banker, Nov. 10, 2010, 12:00 pm, *available at*
http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-
1028474-1.html?zkPrintable=1&nopagination=1.

**B.      Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged
Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers**

55.  Force-placed insurance programs have become a lucrative business for loan
servicers and/or lenders. Commonly, the servicer and/or lender selects the provider through
a pre-arranged agreement and force-places the policy in such a way as to receive an
improper financial benefit. The servicer and/or lender benefits by placing the policy either:
(a) with an affiliate; or (b) with a third party provider who has already agreed to share
revenue with the lender and/or servicer in the form of a direct commission payment,
subsidized portfolio monitoring and/or through "reinsurance" premiums that are ceded to a
subsidiary/affiliate of the servicer (a "captive reinsurance arrangement").

56.  Under the direct payment arrangement, the provider of the force-placed
insurance policy pays a portion of the premium collected either directly to the servicer or to
a subsidiary posing as an insurance "agent" in the form of commissions or as a
"reimbursement" of the servicer's "incurred expenses" related to force-placing the
insurance.

57.  ████████████████████████████████████████████████████

58.  Under the captive reinsurance arrangement, the provider of the force-placed
insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or
"captive reinsurer" of the referring servicer. In return for the subsidiary's agreement to

assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy.

59.   Illustrative of the typical kickback arrangements is the following graphic from *American Banker*:



60.   J. Robert Hunter of the Consumer Federation described these practices in his testimony before the NYSDFS:

> In some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or brokers or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to

lender-affiliated captive reinsurers. Lenders often receive free or below cost services from affiliated service providers.

61.    Another experienced and noted expert in the area of force-placed insurance, Birny Birnbaum of the Center for Economic Justice, testified before the NYSDFS and stated that:

> Servicers have financial incentive to force-place the insurance because the premium includes commission and other consideration for the servicer. With some servicers, the insurance is reinsured through a captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement coverage.

62.    Borrowers have no say or input into the carrier or terms of the force-placed insurance policies. The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer.

63.    For their part, servicers have no incentive to comparison shop for the best rate. Rather, servicers are financially motivated to refer borrowers to the provider that will give the best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums. As the servicer's "commission" (*i.e.*, kickback) and/or reinsurance premium is usually related to the size of the policy, the servicer actually has an incentive to purchase the *highest* priced insurance, an interest diametrically opposed to that of the borrower.

64.    Commonly, a mortgage loan servicer enters into an agreement with an insurance provider pursuant to which it refers borrowers exclusively to the provider for force-placed insurance.

65.  Force-placed insurance policies are not underwritten on an individual policy basis. Rather, servicers' contracts with force-placed insurance providers such as Balboa and QBE require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

66.  As J. Robert Hunter testified recently before the NYSDFS, "[the] lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance."

67.  Servicers often go so far as to actually outsource their insurance processing to the force-placed insurance provider. The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property. In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the servicer. Thus, where these servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral.

68.  While mortgage servicers and lenders like OneWest and the other Defendants profit greatly from force-placing insurance, they maintain a shroud of secrecy and do not separately report their income from payments received from providers of force-placed insurance. However, according to an article published by *American Banker*, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year." *See* Jeff Horowitz, *Attorneys General Draw a*

*Bead on Banks' Force-Placed Insurance Policies*, American Banker (Mar. 10, 2011, 12:25PM), *available at* http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-1034213-1.html (noting that servicers demand generous commissions and other payments in return for their referrals).

69. "The incentives and potential for abuse in the administration of LPI [lender placed insurance] are great. Consumers do not request the insurance, but are forced to pay for it. The cost of LPI is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases; the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the servicer from the force-placement of the coverage." *See* July 28, 2011 Testimony of Birny Birnbaum, Executive Director of the Center for Economic Justice, Before the U.S. House of Representatives Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial Services ("Birnbaum House Testimony"), *available at* http://financialservices.house.gov/uploadedfiles/072811birnbaum.pdf.

70. In addition, "[t]he prices for residential property LPI are significantly excessive. In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%. Incredibly, lenders get a commission – totaling hundreds of millions of dollars – out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral. The premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance – so the lenders' cost of tracking all

loans is passed only to those consumers paying for force-place [sic] insurance." *Id*.

71. Servicers commonly attempt to justify the high price of FPI policies by pointing to the higher risk associated with the lack of individual policy underwriting. However, this premise belies the fact that the profit margins generated by force-placed policies are unheard of elsewhere in the insurance industry.

72. Servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property. However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting.

73. As Birny Birnbaum of the Center for Economic Justice testified, servicer explanations for the high cost of force-placed insurance are unsupported by any evidence. Loss ratios have been historically low.

**C.**     **Defendants' Force-Placed Insurance Operations**



REDACTED

76. 

77.

**D.      The Origination of Plaintiff's Mortgage**

78. On or about August 24, 1987, Plaintiff purchased a home located at 4440 Grantley Road, Toledo, Ohio ("Property") and obtained a mortgage to finance the purchase from Toledo Trust Company ("Initial Mortgage"). Plaintiff paid off her Initial Mortgage in or about 1992.

79. Plaintiff subsequently acquired a home equity loan from KeyBank, Cleveland Loan Services ("KeyBank") secured by a mortgage on the Property. As of November 7, 2007, the balance of that loan was $34,951.77.

80. On or about December 7, 2007, Plaintiff obtained a loan secured by her Property ("Mortgage Agreement"), and the lender and servicer at that time was Financial

Freedom Senior Funding. Plaintiff's property had a value estimated at $120,000.

81.  Under the terms of Mortgage Agreement, Plaintiff could draw upon a line of credit established by Financial Freedom Senior Funding up to an amount known as the "Principal Limit." On December 2, 2007, Plaintiff's initial Principal Limit was $88,920. That amount was reduced, however, to $36,555.05 after closing costs ($6,980.75), a discharge of liens including the KeyBank home equity loan ($35,762.72), a loan advance to Plaintiff ($5,000), and a servicing fee set aside ($4,621.48).

82.  The servicing fee set aside of $4,621.48 represented an "amount . . . to be applied to payments due for a fixed monthly charge for servicing activities of Lender or its servicer" and was not available for draw by Plaintiff.

83.  The terms of the Mortgage Agreement also required the payment of certain property charges, as detailed in paragraphs 2,3, and 5:

> **2. Payment of Property Charges.** Borrower shall pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreements.
>
> **3. Fire, Flood, and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire. This insurance shall be maintained in the amounts, the extend and for the periods required by Lender or the Secretary of Housing and Urban Development ("Secretary"). Borrower shall also insure

all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extend required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to Lender.

\*        \*        \*

**5. Charges to Borrower and Protection of Lender's Rights in the Property.** . . . If Borrower fails to make these payments or the property charges required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

To Protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities as defined in the Loan Agreement. Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

*See* Mortgage, attached hereto as Exhibit 2 at 2-3.

**E.      OneWest   Charged   Plaintiff   for   Force-Placed   Insurance   Pursuant   to Lucrative  Pre-Arranged  Agreements  After  Issuing  Materially  False  and Misleading Notices**

84. In  or  around  June  2008,  Regan  Insurance  Agency  ("Regan"  Insurance"), Plaintiff's homeowner's  insurance  agent,  informed  Plaintiff that  Financial  Freedom Senior Funding required Plaintiff to maintain flood insurance on her home. As a result,

Plaintiff purchased the insurance on her own, at a total premium of approximately $600.

85. Approximately six months later, in April 2009, Regan Insurance informed Plaintiff that Financial Freedom Senior Funding was demanding that Plaintiff provide $200 to $300 more for her flood insurance.

86. Plaintiff's individually acquired flood insurance premiums were between approximately $800 and $1,200 per year.

87. Between 2009 and 2012, Financial Freedom Acquisition, Financial Freedom, and OneWest (through Newport) issued Plaintiff materially false and misleading notices by U.S. mail relating to forced-placed insurance.

    i.    Financial Freedom Acquisition's Misleading Notices

88. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

89. On June 22, 2010, Financial Freedom Acquisition (though Newport) issued a notice stating that Plaintiff's flood insurance was inadequate and that if she did not provide proof of adequate insurance Financial Freedom Acquisition would "purchase the **additional** flood insurance (lender-placed insurance) required and charge [Plaintiff] for the cost of the insurance." *See* June 22, 2010 Financial Freedom Acquisition Notice, attached hereto as Exhibit 3 at 1 (emphasis in original). The notice also stated that "LENDER-PLACED FLOOD INSURANCE MAY BE SIGNIFICANTLY HIGHER

THAN THE COST OF INSURANCE PURCHASED THROUGH YOUR OWN AGENT OR COMPANY." *Id.* at 2 (capitalization in original). On July 20, 2010, Financial Freedom Acquisition issued another notice essentially restating the above. *See generally* July 20, 2010 Financial Freedom Acquisition Notice attached hereto as Exhibit 4.

90. 

91. Moreover, the notices were objectively false and misleading because they failed to disclose, *inter alia*: (1) OneWest and its affiliates had preexisting agreements with Newport, Balboa, and Meritplan that guaranteed OneWest (through IndyMac) would receive unearned, substantial kickbacks and below market-cost portfolio monitoring; and (2) that the cost of force-placed insurance was "significantly higher" because of an illicit *quid pro quo* arrangement between and/or among OneWest, Financial Freedom Acquisition, IndyMac, Newport, and Balboa whereby OneWest received substantial kickbacks and other unearned consideration in return for giving Balboa, and its wholly owned subsidiary, Meritplan, the exclusive right to receive inflated, noncompetitive force-placed premiums on OneWest's entire loan portfolio.

26

ii.      OneWest's Misleading Notices

92. 

93.

*See* June 12, 2012 OneWest Notice, attached hereto as Exhibit 5 at 1-2.

94. On July 10, 2012, OneWest sent Plaintiff another notice stating:

> [W]e will be required to obtain flood insurance coverage for you . . . . The cost of lender placed insurance is significantly higher than an independent insurance policy and will only cover your dwelling . . . . If we purchase flood insurance on your behalf, the cost of that insurance will be charged to the outstanding balance of your loan, and, if there are insufficient funds in your line of credit, arrangement will have to be made for repayment. We and/or our affiliates may receive compensation in connection with the insurance policy described in this letter.

*See* July 10, 2012 OneWest Notice, attached hereto as Exhibit 6 at 1.

95. On August 20, 2012, OneWest sent Plaintiff a final notice informing her that it force-placed flood insurance on her Property at a cost of $1,791.39, covering a term of

June 5, 2012 until June 5, 2013. The letter also stated, in relevant part, that Plaintiff was "**responsible for the cost of [force-placed] insurance" and that "[t]he cost of this insurance may be significantly more than the cost of insurance you can obtain on your own** . . . . We and/or our affiliates may receive compensation in connection with the insurance policy described in this letter." *See* August 20, 2012 OneWest Notice, attached hereto as Exhibit 7 at 1-2 (bold in original).

96. The August 20, 2012 notice included a breakdown of the cost of the force-placed insurance and noticeably omitted any reference to the commission received by IndyMac on OneWest Bank's behalf:

| | |
|---|---|
| Insurance Charges | $1,735.00 |
| Policy Fee: | $0.00 |
| Stamping Fee: | $4.34 |
| Surplus Lines Tax | $52.05 |
| TOTAL: | $1,791.39 |

*See id.* at 1.

97. The $1,735 dollar amount listed above is later listed as a "premium" in the August 20, 2012 notice under the heading "Evidence of Flood Insurance." *See id.* at 3. No mention of the commission paid to IndyMac is included in this second list.

98. Rather than pay the threatened $1,790, Plaintiff tried to obtain the demanded insurance from her private agent. However, Plaintiff was unable to afford the required full year payment.

99. Upon receipt of the final OneWest notice, Plaintiff called Financial Freedom or Newport to explain that she was having trouble purchasing her own flood insurance for

REDACTED

the entire year in the one lump payment of $1,200. In response, the customer representative informed her that she should either purchase her own flood insurance or Financial freedom would purchase it for her and she could enter a repayment agreement.

100. Around August 2012, due in part to paying inflated, noncompetive premiums that included OneWest's kickbacks, Plaintiff no longer had funds available in her line of credit.

101. Due to the depletion of her line of credit, on September 20, 2012, Plaintiff executed a Repayment Agreement for $1,791.39 with OneWest. Under the terms of that Repayment Agreement, Plaintiff was informed that "(ii) Failure to cure the repayment amount set forth below . . . could result in Financial Freedom [i.e., OneWest] declaring your reverse mortgage loan due and payable. If the default remains unresolved, this may result in the initiation of proceedings to foreclose and ultimately the loss of your home." *See* September 14, 2012 Repayment Agreement, attached hereto as Exhibit 8 at 1. The repayment agreement also informed Plaintiff that:

> As stated in your reverse mortgage loan documents, you must pay your property charges timely. Your failure to do so has resulted in Financial Freedom advancing funds on your behalf, which must be repaid. The total repayment amount of $1,791.30 is calculated based on the actual disbursement amount of property charges, less any available line of credit balance at the time of the disbursement(s) and any repayments received to date.

102. Beginning on or around October 15, 2012, as a result of the foregoing repayment agreement, Plaintiff began paying $149.23 per month for the flood insurance

force-placed in 2012.

103. Beginning in April, 2013, OneWest Bank (through Newport) essentially repeated the cycle of letters sent in 2012. On April 21, 2013, OneWest Bank sent a notice to Plaintiff warning that her force-placed flood insurance would expire in 45 days. On June 12, 2013, OneWest Bank notified Plaintiff of a second force-placement of flood insurance for $1,790.52, covering a term from June 5, 2013 until June 5, 2014.

104. On June 12, 2014, OneWest Bank notified Plaintiff of a force-placement of flood insurance for $1,790.52, covering a term from June 5, 2014 until June 5, 2015.

105. On September 3, 2014, Plaintiff executed another Repayment Agreement with OneWest Bank. Pursuant to the terms of that Repayment Agreement, Plaintiff must pay $222.43 a month for the cumulative cost of her force-placed insurance for a two-year term starting September 2014 and ending August 2016 (for a total repayment of $5338.19). *See generally* August 31, 2014 Repayment Agreement, attached hereto as Exhibit 9.



C.  

D.

E.

F.

107. If the foregoing notices sent by OneWest and Financial Freedom Acquisition contained this material information, a reasonable borrower would not have paid for or agreed to the force-placed insurance without protest.

**F.    Government Response to Mortgage Lender and Servicer Force-Placed Insurance Practices**

108. Force-placed insurance practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of government investigations prompted by concerns that consumers are being gouged when they are

force-placed insurance following a lapse in their policies.

109.  State attorneys general are cognizant of and have taken action concerning servicers' abusive practices concerning force-placed insurance. Recently, a coalition of forty-nine (49) state attorneys general entered into a historic joint state-federal settlement agreement with the country's five largest loan servicers ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis. *See* www.nationalmortgagesettlement.com/ (official website established by the government relating to the settlement); *see also* Jeff Horowitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, American Banker (Mar. 10, 2011, 12:25 PM) (http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-034213-1.html).

110.  Among other terms, the settlement essentially prohibits servicers from profiting from force-placed insurance. Specifically, under the settlement, mortgage servicers: (a) shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless of homeowner payment; and (e) must purchase the force-placed insurance for a commercially reasonable price. *Id.*; *see also Consent Judgment, United States of America v. Bank of America Corp.,* Civ. No. 1:12-cv-00361-RMC (D.D.C. Apr.

14, 2012) (ECF No. 14 Section VII).

111.  Notably, state insurance commissioners and federal regulators have investigated and condemned captive reinsurance arrangements in the title insurance industry – which also had a relatively low level of losses – as nothing more than sham transactions designed to funnel unlawful kickbacks for business referrals. *See*, *e.g.*, Broderick Perkins, *Title Insurance Industry in Hot Water with Regulators Again*, SAN JOSE BUSINESS JOURNAL (May 22, 2005), *available at* http://www.bizjournals.com/sanjose/stores/2005/05/23/story4.html.

112.  Indeed, while announcing a $37.8 million settlement with nine title insurers, then Florida Insurance Commissioner John Garamendi stated, "This reinsurance scheme appears to be nothing more than a form of commercial bribery." As a result, a number of providers have abandoned such arrangements altogether. *See* Press Release, Florida Department of Insurance (July 20, 2005), available at http://www.departmentofinsurance.ca.gov/0400-news/0100-press-releases/0080- 2005/release069-05.cfm.

113. Fannie Mae has changed its policies so as to curb bank and servicers' improper practices. Fannie Mae issued a Service Guide Announcement on March 14, 2012, "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements, and allowable reimbursable expenses for lender-placed insurance" for servicers of the loans it holds. The Fannie Mae guidelines seek to eliminate the abuses prevalent in the force-placed insurance industry including

REDACTED

requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude: (1) any lender-placed insurance commission earned on that policy by the servicer or any related entity; (2) costs associated with insurance tracking or administration; (3) or any other costs beyond the actual cost of the lender-placed  insurance policy premium. *See* Fannie Mae Servicing Guide Announcement SVC-2012-04, available at

https://www.fanniemae.com/content/announcement/svc1204.pdf.

114.  The New York State Department of Financial Services' hearings on force-placed insurance resulted in government action and findings that borrowers were over-charged for force-placed insurance. On June 12, 2012, Governor Cuomo's website announced, "DFS Investigation Indicates Insurance Companies Overcharged for Force-Placed Insurance." It stated:

> The evidence of higher than necessary insurance premiums was made clear at a recent DFS hearing. Also, DFS discovered that the force-placed insurance market lacks the sort of competition that would keep premiums down. In New York, two companies have 90 percent of the market. In addition, the hearings made clear that high force-placed insurance costs are having a terrible impact on homeowners, while banks and insurers are profiting off the payments.

*See* Governor Cuomo Announces DFS Action Could Save Some New York Homeowners Millions in Overcharges to Home Insurance, *available at*

http://www.governor.ny.gov/press/06122012DFS.

115.  The relatively low level of losses associated with force-placed insurance

indicates that reinsurance with captives is also unnecessary. For example, during 2009, one insurer collected approximately $2.7 billion of premiums through its specialty insurance division, which is overwhelmingly devoted to force-placed insurance. Notably, this insurer paid out only 36% of this amount in claims, though in the company's other lines of business a 70% claims-to-premiums ratio is the norm. Not surprisingly, far from being an excessive risk, force-placed insurance is actually this insurer's most profitable product.

116.  Birny Birnbaum, in his testimony before the New York Attorney General, presented statistics collected by the NAIC reflecting nationwide loss ratios for lender-placed insurance during the 2004-2011 period as being, on average, more than thirty-five points lower than the ratios for commercially available homeowners policies. *See* Birnbaum NYSDFS Testimony at 9, *available at* http://www.dfs.ny.gov/about/hearings/fp_052012/Birny_Birnbaum_Center_for_Economic_Justice_testimony.pdf. When confined to the period from 2007-2011, the disparity between lender-placed insurance loss ratios and those of commercially available homeowners policies was nearly 42 points. *Id*.

117.  On or about April 18, 2013, Governor Cuomo announced that a NYSDFS investigation produced a New York settlement with Defendant QBE Insurance Corporation. *See* April 18, 2013. The NYSDFS' investigation revealed that:

> QBE competed for business from the banks and mortgage servicers through what is known as "reverse competition." That is, rather than competing by offering lower prices, the insurers competed by offering what is effectively a share in the profits.

35

> This profit sharing pushed up the price of force-placed insurance by creating incentives for banks and mortgage servicers to buy force-placed insurance with high premiums. That's because the higher the premiums, the more that the insurers paid to the banks.
>
> In some cases, QBE paid commissions to insurance agencies and brokers that are affiliates of mortgage servicers. Typically the commissions are ten to twenty percent of the premium written on the servicer's mortgage loan portfolio. **The evidence from the investigation indicates that the affiliated agencies and brokers do little to no work for the commissions QBE had paid them.**

*See* NDYSDFS Press Release, April 18, 2013, *available at*

http://www.dfs.ny.gov/about/press2013/pr1304181.htm. (emphasis added).

118. Three other governmental investigations were brought against QBE related entities. One was noticed by the Minnesota Department of Commerce on March 22, 2013, one by the Office of the Massachusetts Attorney General on April 30, 2013, and one by the Missouri Department of Insurance, Financial Institutions and Professional Registration on July 11, 2013.

**G.  OneWest's Force Placed Insurance Policies and Practices Provide Unearned and Unjustified Profits and Kickbacks to Defendants**

119. As *American Banker* observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business." ***See        Ties        to        Insurers,        available        at***

http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-

REDACTED

1028474-1.html?zkPrintable=1&nopagination=1. These costs are ultimately paid by the borrowers.

120. Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher, implying paydays for servicers amounting to hundreds of millions of dollars per year.

121. Moreover, the charges that OneWest chose to impose upon borrowers for force-placed insurance also unlawfully included the cost of portfolio monitoring and tracking services for OneWest's entire loan portfolio, the cost of which was then passed on to the small percentage of borrowers whose properties were force placed.

122. Unjustified fees which amount to kickbacks also inflate the premiums of force placed insurance:

> The classic role of the insurance producer is to help the policyholder determine her insurance needs and shop the market for the insurance product that meets the policyholder's needs while seeking the most competitive price for the product. Such activities simply do not exist in [FPI] because there are only two national providers of the necessary package of insurance and related services and there is no price competition among the insurers. Soliciting new business consists of asking typically two venders for proposals – and such activity is a rare event for most servicers.

Birnbaum NYSDFS Testimony at 18, *available at*

http://www.dfs.ny.gov/about/hearings/fp_052012/Birny_Birnbaum_Center_for_Economic_Justice_testimony.pdf.

123.  OneWest's practices of unlawfully profiting from force-placing insurance policies tend to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks. Amounts paid to servicers and their affiliates as commissions and reinsurance premiums have become a part of the cost of doing business for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of these kickbacks – to the detriment of consumers.

124.  OneWest, along with Financial Freedom Acquisition and IndyMac, have threatened and, indeed, stifled competition through this scheme. As the NAIC recently opined when asked whether pricing in the area of force-placed insurance is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects bank's interests or one where they are provided with an incentive or inducement to enter into the transaction." *See Ties to Insurers, available at* http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html?zkPrintable=1&nopagination=1.

## CLASS ACTION ALLEGATIONS

125.  Plaintiff asserts her RICO claims on behalf of the following proposed nationwide Class:

> All persons who have or had a mortgage loan or line of credit owned, originated or serviced by OneWest Bank, N.A. and/or its affiliates secured by property located in United States and, in connection therewith, were charged for "force-placed" insurance on the secured property within the applicable statute

of limitations.

126.  Plaintiff asserts her unjust enrichment claims on behalf of the following proposed Ohio sub-Class:

> All persons who have or had a mortgage loan or line of credit owned, originated or serviced by OneWest Bank, N.A. and/or its affiliates secured by property located in Ohio and, in connection therewith, were charged for "force-placed" insurance on the secured property within the applicable statute of limitations.

127. These Classes exclude any judge or magistrate assigned to this case, Defendants and any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, and assigns.

128.  Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Class includes likely thousands of OneWest's customers.

129.  Typicality: Plaintiff's claims are typical of the members of the proposed Class.

130.  Adequacy: Plaintiff will fairly and adequately protect the interests of the Class, and has retained counsel experienced in complex class action litigation. Plaintiff has no interests which are adverse to those of the Class that they seek to represent.

131.  Commonality: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

> A.  Whether Defendants' form letters to borrowers materially misrepresent the nature of force-placed insurance;

39

REDACTED

B. Whether OneWest maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

C. Whether OneWest received commissions or any other payments or things of value from force-placed insurance providers;

D. Whether OneWest participated in arrangements that involved kickbacks;

E. Whether Defendants received financial benefits from the force-placed insurance providers in the form of insurance monitoring, tracking and processing services;

F. Whether Defendants received unauthorized and illicit payments in connection with force-placed insurance that were unrelated to a *bona fide* service in connection with the force-placed insurance and its purpose;

G. Whether Defendants received payments in connection with force-placed insurance that exceeded the value of any services actually performed or that were otherwise commercially unreasonable;

H. Whether OneWest, Financial Freedom Acquisition, IndyMac, Balboa, Meritplan, Newport, and QBE Insurance Corporation devised a scheme to defraud borrowers and loan owners by overcharging them for force-placed insurance;

I. Whether the scheme alleged herein constitutes mail or wire fraud;

J. Whether Defendants have been unjustly enriched;

K. Whether OneWest's exclusive insurers have been unjustly enriched;

L. Whether Defendants are liable to Plaintiff and the Class for damages and, if so, the measure of such damages; and

M. Whether Plaintiff and the Class are entitled to declaratory, injunctive, and other equitable relief.

132. These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

133. Plaintiff is a member of the Class and will fairly and adequately represent and protect the interests of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of this litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

134. Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

135. Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

136. Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

137.  Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

138.  Plaintiff reserves her right to modify or amend the definition of the proposed Class at any time before the Class is certified by the Court.

## COUNT I

## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
### (Against all Defendants)

139.  Plaintiff repeats and realleges each and every paragraph above as if set forth herein.

140.  Plaintiff, each Class member, and each Defendant, are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

### The Enterprise

141.  For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of the Defendants, including their respective officers, directors, employees, agents and direct and indirect subsidiaries ( "Enterprise"). The Enterprise was separate and distinct from the persons that constituted the Enterprise.

142.  The Enterprise was primarily managed by OneWest, which organized the fraudulent scheme and procured the involvement of the Defendants. Each of the

Defendants, however, agreed to, and did, participate in the conduct of the Enterprise, and carried out their roles using broad and independent discretion.

143.   The companies and individuals that constitute the Enterprise were associated for the common purpose of defrauding borrowers and loan owners by overcharging them for force-placed insurance with respect to OneWest-serviced loans. The purpose thereof was to induce borrowers to pay, and the owners of the loans to incur, overcharges in respect to such insurance. At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce. The proceeds of the Enterprise were distributed to its participants, OneWest, Financial Freedom Acquisition, Newport, Balboa, QBE, and their affiliates.

144.   The Enterprise operated from at least March 2009. Its operation is ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

145.

146.

REDACTED



147.

148.

149.

150.

REDACTED



151.

152.

153.

45



154.

155. Because IndyMac was a wholly owned subsidiary of OneWest, the kickbacks IndyMac received from Balboa and QBE were kickbacks received by OneWest.

156.

REDACTED

## <u>The Pattern of Racketeering Activity</u>

157. At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this Complaint. The Defendants have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

158.

159.

160.

161.

162.

163.



47



167. OneWest retains the rebates/kickbacks for itself, while billing and charging borrowers based on the full purported price of the force-placed insurance. The rebates/kickbacks reduce OneWest's force-placed insurance costs, but those savings are not passed through to borrowers. Instead, borrowers are billed and charged the full purported price of the force-placed insurance even though that does not reflect the actual cost of the insurance policy.

169. Because amounts paid for force-placed insurance are servicing advances,

OneWest has inflated charges to borrowers by failing to pass through the rebates/kickbacks to borrowers. OneWest reimburses itself from the proceeds of the loans based on the inflated servicing advances. To the extent borrowers fail to pay, loan owners bear the inflated charges.

170.



171.

172.

173. The notices are materially false by representing that borrowers are responsible for the "cost of insurance" when they are actually more than just the cost of the insurance. They are charged for the undisclosed "commission" that OneWest receives.

174.

REDACTED



175. The notices and statements lull borrowers into believing that no fraudulent scheme is occurring and that Onewest, Newport, Balboa, Meritplan, QBE and/or their affiliates are simply exercising OneWest's rights under borrowers' mortgage loan agreements. By lulling Plaintiff and the Class into a false sense of security, the notices and statements make it less likely that borrowers will object to the improper charges, complain to the authorities, or bring lawsuits.

176.



177. 

## <u>The Predicate Acts of Mail and Wire Fraud</u>

178. The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, the Enterprise engaged in an intentional scheme or artifice to defraud borrowers and the owners of the loans serviced by OneWest and to obtain money or property from said borrowers and loan owners

through false or fraudulent pretenses, representations and promises.

179.  The bribes, kickbacks, false statements and omissions, and mail and/or wire communications of OneWest, Balboa, QBE and their affiliates in furtherance of the scheme constituted predicate acts of mail and/or wire fraud.

180.  It was reasonably foreseeable to OneWest, Balboa, QBE and their affiliates that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

181.  The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. The precise dates of such transmissions cannot be alleged without access to the books and records of Defendants. Nevertheless, Plaintiff can allege such transmissions generally.

182.  For the purpose of furthering and executing the scheme, OneWest, Balboa, QBE and their affiliates regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier. For example:

183.  Newport issued materially false and misleading notices relating to force-placed insurance to borrowers via mail;

184.  Newport also communicated to borrowers with respect to force-placed insurance issues by telephone;

52

185.  OneWest issued monthly statements incorporating the falsely overstated force-placed insurance charges to borrowers via mail and/or wire;



REDACTED

190.  

191.  Each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and the owners of the loans.

192.  OneWest, Balboa, QBE and their affiliates each participated in the scheme to defraud knowingly, willfully and with a specific intent to defraud borrowers and the owners of the loans into paying and/or incurring falsely inflated, unauthorized charges in connection with force-placed insurance.

193.  The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and loan owners to pay and incur the falsely inflated, unauthorized charges with respect to force-placed insurance and thereby enable OneWest, Balboa, QBE and their affiliates to reap illicit profits.

194.  OneWest, Balboa, QBE and their affiliates were common participants in the predicate acts. Their activities amounted to a common course of conduct, with similar

REDACTED

pattern and purpose, intended to deceive borrowers and owners of the loans.

## Honest Services Fraud

195. The scheme alleged herein also constitutes "honest services" fraud in violation of 18 U.S.C. § 1346.

196. The wire fraud and mail fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."

197. The mail fraud statute reads in relevant part as follows:

> Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises . . . [uses the mails in furtherance of the scheme shall be punished by imprisonment or fine or both].

18 U.S.C. § 1341.

198. The wire fraud statute is in relevant respects identical. *See* 18 U.S.C. § 1343.

199. 18 U.S.C. § 1346 provides:

> For the purposes of this chapter [including § 1341 and § 1343], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services.

18 U.S.C. § 1346.

200. Through 18 U.S.C. § 1346, Congress brought schemes to deprive another of honest services within the scope of the mail and wire fraud statutes.

201. In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court addressed the scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute criminalizes "fraudulent schemes to deprive another of honest services through bribes or

kickbacks." *Id.* at 404. In fact, the Court held that, for purposes of the mail and wire fraud statutes, the term "scheme or artifice to defraud" in 18 U.S.C. § 1346 (the "honest services" provision), applies to bribes and kickbacks. The Court stated that "there is no doubt that Congress intended § 1346 to reach *at least* bribes and kickbacks" because the "vast majority" or pre-*McNally* honest services cases involved bribery or kickback schemes. *Id.* at 365.

202.



**The Predicate Acts of Extortion,
Attempted Extortion,
And Conspiracy to Commit Extortion**

203. The pattern of racketeering activity also consisted of extortion, attempted extortion, and conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a).

204. As alleged above, the mortgage loan agreements of Plaintiff and the Class authorize the lender to charge borrowers the costs of any LPI placed on their property. Nothing in the agreements authorizes the lender to charge any amount in excess of the lender's cost. Pursuant to the scheme alleged herein, however, Plaintiff and the Class were charged amounts in excess of OneWest's force-placed costs with respect to the borrowers' property. The rebates/kickbacks that OneWest received reduced such costs. Nevertheless, OneWest charged borrowers based on the full purported price of the force-placed insurance.

205. 

206. As alleged above, the mortgage loan agreements of Plaintiff and the Class entitled OneWest to add any force-placed insurance charges to the balances of their loans and to foreclose in order to collect such charges if unpaid. The mortgage loan agreements provide, in words or substance, that any LPI charges "shall become additional debt of Borrower as provided in the Loan Agreement and shall be secured by this Security

Instrument," Exhibit 2 at ¶ 5, and that the lender or its authorized servicer is entitled to foreclose to collect any unpaid amounts due.

207. ███████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

208. Mortgage loan servicers routinely collect unpaid LPI charges through foreclosure. Superintendent Lawsky found that LPI charges frequently "push distressed homeowners over the foreclosure cliff."

209. Indeed, Plaintiff's loan was placed in default when she could not afford the force-placed insurance premium charged to her in 2012. Only by acquiescing to OneWest and agreeing to nearly $5,000 in payment did she avoid foreclosure.

210. By virtue of the facts alleged above, Plaintiff and the Class reasonably believed: (i) that OneWest possessed the power to collect any unpaid force-placed insurance charges through foreclosure; and (ii) that OneWest would exploit that power and foreclose if borrowers failed to pay the LPI charges that were imposed.

211. ███████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████



212.  Plaintiff and the Class received nothing of value in exchange for payment of the excess LPI charges.

## Injury to Plaintiff and the Class

213. 

214.  Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

215. 

███████████████████

## COUNT II

**CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT, 18 U.S.C. § 1962(d)**
**(Against All Defendants)**

216.  Plaintiff repeats and realleges each and every paragraph above as if set forth herein.

217. RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

218. As set forth in Count I, above, at all relevant times, Plaintiff and the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

219. Defendants and their affiliates formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently overcharging borrowers and loan owners with respect to LPI. The purpose thereof was to induce borrowers and loan owners to pay or incur fraudulently inflated, unauthorized charges with respect to LPI.

220. The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

221. As set forth in Count I, above, Defendants and their affiliates conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of

60

18 U.S.C. § 1962(c).

222. Defendants and their affiliates were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

223. Defendants and their affiliates committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I.

224. As a direct and proximate result of the overt acts and predicate acts of Defendants in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their business and property in an amount to be determined at trial. Such injuries include, but are not limited to, fraudulently inflated charges with respect to LPI, as a direct, proximate and foreseeable result of the scheme alleged herein.

225. Under the provisions of 18 U. S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

226.



## COUNT III

### UNJUST ENRICHMENT/DISGORGEMENT
### (AGAINST ONEWEST AND FINANCIAL FREEDOM ACQUISITION L.L.C.)

227. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

228. OneWest and Financial Freedom Acquisition have been unjustly enriched as a result of the conduct described in this Complaint and other inequitable conduct. The kickbacks, commissions and other compensation that OneWest and Financial Freedom Acquisition received in connection with force-placed insurance were not legitimately earned, and came at the ultimate expense of its customers who had insurance force-placed on them.

229. OneWest and Financial Freedom Acquisition accepted and retained these payments under such circumstances that it would be inequitable for OneWest and Financial Freedom Acquisition to retain the benefit without payment to Plaintiff and the other Class members.

230. Plaintiff and the Class members have conferred a substantial benefit upon OneWest and Financial Freedom Acquisition from the force-placed insurance premiums paid by Plaintiff and the Class members.

231. As a result of OneWest's and Financial Freedom Acquisition's unjust enrichment, Plaintiff and the Class members have sustained damages in an amount to be determined at trial and seek a full disgorgement and restitution of OneWest's and Financial Freedom Acquisition's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above and throughout the Complaint.

**COUNT IV**

**UNJUST ENRICHMENT**
**(AGAINST DEFENDANTS BALBOA INSURANCE COMPANY, QBE INSURANCE CORPORATION, AND NEWPORT MANAGEMENT CORPORATION)**

232. Plaintiff incorporates by reference the allegations in the preceding paragraphs.



237. 

238.  Plaintiff and the Class have thus conferred a substantial benefit upon the Insurer Defendants.

239. Under such circumstances, it would be inequitable for the Insurer Defendants to retain these benefits without payment to Plaintiff and the other Class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for relief as follows:

A.  Determining that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.  Designating Plaintiff as Class representative;

C.  Designating Plaintiff's counsel as counsel for the Class;

D.  Issuing proper notice to the Class at Defendants' expense;

E.  Declaring that Defendants' conduct violated RICO;

F.  Declaring that Defendants' conduct as alleged herein was inequitable and that Defendants were unjustly enriched by their conduct;

G.  Declaring that Defendants acted willfully in deliberate or reckless disregard of applicable law and the rights of Plaintiff and the Class

as alleged herein;

H.      Awarding appropriate equitable relief, including restitution and an injunction requiring Defendants to reverse all unlawful, unfair, or otherwise improper charges for insurance coverage, allowing customers to close loans without first paying premiums for insurance that were not necessary or required by law, prohibiting Defendants from imposing unfair and unlawful insurance requirements on borrowers, prohibiting Defendants from earning commissions or other compensation for themselves or affiliated entities on force-placed insurance policies, and requiring Defendants to cease and desist from engaging in further unlawful conduct in the future;

I.      Awarding actual damages, treble damages, punitive damages, and interest;

J.      Awarding reasonable attorneys' fees and costs to the full extent permitted by law; and

K.      Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

Dated: February 24, 2015                  Respectfully submitted,

                                          /s/ Stephen Fearon, Jr.
                                          Stephen J. Fearon, Jr. (admitted *pro hac vice*)
                                          **SQUITIERI & FEARON, LLP**
                                          32 East 57th Street, 12th Floor
                                          New York, New York 10022
                                          Tel: (212) 421-6492
                                          Fax: (212) 421-6553
                                          Email: stephen@sfclasslaw.com

                                          **ZOLL, KRANZ & BORGESS, LLC**
                                          Pamela A. Borgess (0072789)
                                          James G. O'Brien (0088460)
                                          6620 W. Central Ave.
                                          Suite 100

REDACTED

Toledo, OH 43617
Tel: (419) 841-9623
Fax: (419) 841-9717
Email: pamela@zkblaw.com
Email: jim@zkblaw.com

*Counsel for Plaintiff and the Proposed Class*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Class demand a trial by jury.

/s/ *Stephen J. Fearon, Jr.*
Stephen J. Fearon, Jr.