IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Dolores Gorsuch,  Case No. 3:14 CV 152
*Individually and on behalf of a Class*,

                                  Plaintiffs,  AMENDED MEMORANDUM
OPINION AND ORDER DENYING
MOTIONS TO DISMISS

        -vs-

                                  JUDGE JACK ZOUHARY

OneWest Bank, FSB, et. al,

                                  Defendants.

## INTRODUCTION

This Court must decide if Plaintiff Dolores Gorsuch states plausible federal and state law claims arising out of the manner in which Defendants (mortgage servicers and insurance-related entities) purchased flood insurance for Gorsuch's home, after Gorsuch failed to do so on her own.

Defendants move to dismiss (Docs. 68, 72); Gorsuch opposes (Docs. 76–77). The rest of the story follows.

## BACKGROUND

**The Servicers and Insurers**

The "Servicer Defendants" are OneWest Bank, N.A. and Financial Freedom Acquisitions, LLC and the "Insurer Defendants" are Balboa Insurance Co., QBE Insurance Corp., and Newport Management Corp. Agreements between these parties kicked in when a homeowner, like Gorsuch, failed to properly insure property which served as collateral for a mortgage loan. OneWest is the servicer on Gorsuch's reverse mortgage (Doc. 53 at ¶ 20). In July 2011, OneWest received loan

servicing rights from its wholly owned subsidiary, Financial Freedom Acquisitions ("FFA") (*id.* at ¶¶ 20–21, 25). Nonparty IndyMac Financial Services, Inc., is a licensed insurance producer and a wholly owned subsidiary of OneWest (*id.* at ¶ 26). OneWest did business with insurance providers Balboa and QBEIC (*id.* at ¶¶ 34–35, 39, 43–44, 56–57). Newport was OneWest's insurance-services provider (*id.* at ¶¶ 30). Before June 2011, Newport was Balboa's wholly owned subsidiary; after June 2011, Newport was QBEIC's wholly owned subsidiary (*id.* at ¶ 28).

**The Alleged LPI Arrangement**

Roughly sketched, the lender-placed insurance ("LPI") arrangement worked as follows: OneWest first provided Balboa and then (after June 2011) provided QBEIC "the exclusive and lucrative right to receive premiums for force-placed hazard, flood, and wind insurance" for OneWest's portfolio of loans whenever a borrower failed to provide adequate flood insurance (*id.* at ¶¶ 35, 43). As part of the agreement, Balboa and QBEIC's subsidiary, Newport, monitored OneWest's portfolio to ensure loan collateral carried proper flood insurance (*id.* at ¶ 30). Using Servicer Defendant letterhead, Newport warned borrowers of insurance shortfalls (*id.*). If left uncorrected, Defendants shored up insurance coverage by force-placing insurance.

After default on the insurance obligation, force-placing began with the Servicer Defendants forwarding LPI premiums to Newport and adding the advance as additional debt on the borrower's loan (*id.* at ¶¶ 52, 159). Once Newport received gross LPI premiums from the Servicer Defendants, it sent shares of the premiums in two directions.

First, Newport reported monthly to Balboa and QBEIC, describing "net premiums collected from OneWest and paid to Newport's corporate parents" to cover LPI (*id.* at ¶ 32). The LPI premiums

reflected "noncompetitive and substantially inflated" rates charged by Balboa, QBEIC, or an affiliate (*id*. at ¶¶ 36, 76–77).

Second, Newport sent a fixed percentage of the LPI premiums to OneWest subsidiary IndyMac (*id*. at ¶ 36). IndyMac called itself an insurance agent, and its cut of the LPI premiums a "commission". But in fact IndyMac performed no work for this payment and had no role in connecting the Servicer Defendants with Balboa, QBEIC, and Newport (*id*. at ¶¶ 74, 117, 154). IndyMac did not keep the "commission" either. IndyMac instead sent the "commission" to OneWest as a kickback, part of the Insurer Defendant's quid pro quo for the Servicer Defendants' lucrative LPI business (*id*. at ¶¶ 74, 174). Along with below-cost insurance services from Newport, the kickbacks effectively were "rebates" that "reduce[d] OneWest's [LPI] costs," savings not passed on to borrowers (*id*. at ¶¶ 90, 150). But the arrangement did more than fail to pass on such savings: because each Defendant's cut of the pie increased with gross LPI premiums, Defendants sought to purchase "the *highest* priced [LPI] insurance" (*id*. at ¶ 63) (emphasis in original).

**The LPI Arrangement Applied to Gorsuch**

Gorsuch's mortgage agreement required her to obtain adequate flood insurance. If she failed to do so, the agreement authorized her lender to "do and pay whatever is necessary to protect the value of the Property and the Lender's rights in the property" (*id*. at ¶ 83). OneWest (or its predecessor) demanded that Gorsuch obtain flood insurance on her loan's collateral -- her home -- then periodically ordered her to increase her property's flood insurance policy limit (*id*. at ¶¶ 84–85).

In June 2010, Newport again told Gorsuch her flood insurance coverage was inadequate. "[I]f we do not receive proof [within 45 days] that you have adequate flood insurance for the property," Newport wrote, "we will purchase the additional flood insurance (lender-placed insurance) required

3

and charge you for the cost of the insurance" (Doc. 53-3 at 2). Newport urged Gorsuch to contact her private insurance agent, who in most cases "can provide flood insurance at the lowest cost available" through the National Flood Insurance Program (*id*. at 2–3). The alternative, LPI, would cost Gorsuch an estimated $281 in additional annual flood insurance premiums. Newport warned Gorsuch "IF WE MUST OBTAIN LENDER-PLACED FLOOD COVERAGE FOR YOU BECAUSE OF YOUR FAILURE TO FORWARD EVIDENCE OF ADEQUATE FLOOD INSURANCE, THE COST OF THIS LENDER-PLACED INSURANCE MAY BE SIGNIFICANTLY HIGHER THAN THE COST OF INSURANCE PURCHASED THROUGH YOUR OWN AGENT OR COMPANY" (*id*. at 3) (capitalization as in original); *see also* Doc. 53-4 (similar warning in July 2010).

In June 2012, Newport wrote Gorsuch, once more warning of flood insurance coverage shortfalls and putting Gorsuch to the same choice as in 2010: obtain increased coverage (likely with low premiums), or have OneWest obtain additional LPI coverage on her behalf (likely with high premiums) (Doc. 53-5 at 2–3). Newport advised "[w]e and/or our affiliates may receive compensation in connection with the insurance coverage described in this letter" (*id*. at 3); *see also* Doc. 53-6 (similar warning in July 2012).

Because Gorsuch did not timely respond to the 2012 warning letters, in August 2012 Newport told Gorsuch it had obtained additional flood insurance on her behalf. Though FFA advanced funds to cover the premiums, Gorsuch was "responsible for the cost of this insurance" (Doc. 53-7 at 2). Again, Newport advised that LPI was "significantly" more expensive than borrower-obtained insurance, and that OneWest "may receive compensation" for purchasing LPI on Gorsuch's behalf (*id*. at 3). The new, year-long flood insurance coverage cost roughly $1,800. OneWest broke down the

4

total, showing amounts attributable to "premium," "surplus lines tax," and "stamping fee," but not "compensation" received by OneWest or Newport's whole-portfolio loan tracking costs (*see id.* at 4).

Gorsuch had the option to buy her own flood insurance; if she did, OneWest would cancel the LPI policy (*see id.* at 3). She contacted her private insurance agent, but the agent could only offer policies that required an up-front payment of $1,200, covering the annual insurance premium (Doc. 53 at ¶¶ 98–99). Gorsuch could not afford the up-front payment (*id.*). Because OneWest added the advanced LPI premiums to her outstanding loan balance, in August 2012 Gorsuch exhausted her reverse mortgage credit line (*id.* at ¶ 100).

Gorsuch then entered a repayment agreement with OneWest, calling for monthly payments of $149 for the 2012 LPI policy (*id.* at ¶ 102). OneWest renewed LPI coverage for Gorsuch's property in 2013 and 2014, repeating the cycle of warning letters and repayment agreements (*id.* at ¶¶ 103–05). Gorsuch "must pay $222.43 a month for the cumulative cost of her [LPI] for a two year term starting September 2014 and ending August 2016" (*id.* at ¶ 105).

**Gorsuch's RICO Allegations**

Gorsuch alleges an association-in-fact RICO enterprise, comprised of the entities depicted in the chart attached as an Appendix to this Order. The enterprise had the "common purpose of defrauding borrowers and loan owners by overcharging them for [LPI] with respect to OneWest-serviced loans" (*id.* at ¶¶ 141–43; *see also id.* at ¶¶ 145–56).

Gorsuch claims the enterprise engaged in a pattern of racketeering activity, marked by three predicate acts. First, Defendants committed mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. In furtherance of a scheme to defraud borrowers, Defendants sent or caused to be sent written letters and phone calls, funds for LPI premiums and kickbacks, remittance and monthly servicing

reports, and repayment agreements (*id.* at ¶¶ 179–89). Second, Defendants engaged in honest-services fraud, in violation of 18 U.S.C. § 1346. OneWest and FFA "owed legal duties to render services" to borrowers, including maintaining insurance on the property, but "breached [their] obligation to render 'honest services'" by joining a scheme to defraud borrowers and extract kickbacks (*id.* at ¶ 202). Third, Defendants committed extortion and conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C § 1951(a). Defendants "wrongful[ly] use[d the] actual or threatened fear of economic harm" to extract payments, telling the borrower that a failure to pay LPI could lead the lender to foreclose on the property that secured the loan (*id.* at ¶ 205).

## STANDARD OF REVIEW

Federal Civil Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." When Gorsuch alleges fraud, she "must state with particularity the circumstances constituting fraud." Federal Civil Rule 9(b). This Court tests a complaint's legal sufficiency by accepting as true all well-pled factual allegations and construing the complaint in the light most favorable to the plaintiff. *See Duabay v. Wells*, 506 F.3d 422, 426 (6th Cir. 2007). A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

**DISCUSSION**

Defendants jointly raise three arguments in support of dismissal, claiming Gorsuch fails to adequately allege (1) predicate acts (*see* Doc. 68 at 10–21; Doc. 72 at 8–12), (2) a RICO enterprise (*see* Doc. 68 at 23–25), or (3) injury proximately caused by the enterprise (*see id.* at 21–23). The Insurer Defendants separately argue Gorsuch cannot bring an unjust enrichment claim as to them (*see* Doc. 72 at 12–16). Finally, the Insurer Defendants assert that Gorsuch fails to plead facts showing Balboa or QBEIC participated in the RICO enterprise, or successor or vicarious liability for the acts of subsidiary Newport (*see* Doc. 72 at 16–20). Count II, an 18 U.S.C. § 1692(d) RICO conspiracy claim, rises or falls with the substantive RICO claim in Count I. *Cf. Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 495 (6th Cir. 1990).

**Gorsuch Adequately Alleges Predicate Acts**

Defendants argue Gorsuch fails to point to fraudulent correspondence or other communications sent by mail or the wires. "Mail fraud consists of (1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme," while wire fraud replaces mail fraud's use-of-the-mails element with use of the wires. *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (internal quotation marks omitted).

"A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005); *see also United States v. Turner*, 465 F.3d 667, 680 n.18 (6th Cir. 2006) (mail fraud requires a "specific intent to deprive a victim of money or property"). "This means not only that a defendant must knowingly make a material misrepresentation or knowingly omit a material fact, but also that the misrepresentation or omission

7

must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission." *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998). "It is not necessary that the scheme be fraudulent on its face but the scheme must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979).

"It is sufficient for the mailing [or use of wires] to be incident to an essential part of the scheme [to defraud], or a step in the plot," *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989) (internal citation, brackets, and quotation marks omitted), and each transmission need not be false, *Parr v. United States*, 363 U.S. 370, 390 (1960). If a defendant could "reasonably anticipate . . . the use of the mails" or wires, the defendant "causes" the mails or wires to be used. *United States v. Oldfield*, 859 F.2d 392, 400 (6th Cir. 1988). Though Gorsuch must plausibly allege a pattern of racketeering activity proximately caused her injury, she need not allege as a separate element of her claim that she relied on a fraudulent communication. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 655 (2008).

Defendants say the LPI correspondence clearly stated the high cost of LPI premiums, and that OneWest or FFA could be compensated for purchasing LPI. Gorsuch emphasizes certain alleged material misrepresentations contained in the LPI correspondence: that her LPI policy was expensive not because it reflected costs associated with insuring her property against flood, but also the additional costs of the Insurer Defendants' quid pro quos for the Servicer Defendants' lucrative LPI business; that OneWest knew it would be "compensated" for each LPI policy and by how much; that such payments were not "compensation" in the sense of payment for work done, because neither

8

OneWest nor IndyMac performed work to obtain LPI policies; that the "compensation" OneWest received was in fact a "kickback," which the Insurer Defendants provided to secure and maintain the Servicer Defendants' lucrative business; or that borrowers who received LPI (a small fraction of OneWest's portfolio, *see* Doc. 53 at ¶ 121) paid for loan tracking services performed on OneWest's entire portfolio (*see id.* at ¶ 106).

The mail and wire fraud statutes' "scheme to defraud" element is "a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *United States v. Warshak*, 631 F.3d 266, 311 (6th Cir. 2010) (internal quotation marks omitted). At this preliminary stage, Gorsuch alleges facts that "nudge[] [he]r claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Gorsuch claims the LPI correspondence portrayed a straightforward transaction, one that sought to ensure Gorsuch's property carried adequate flood insurance. Account statements and repayment agreements did too. But Gorsuch alleges that, in fact, the Servicer and Insurer Defendants used LPI to extract enormous profits and in-kind benefits, including kickbacks, that were unrelated to the risks of insuring against floods. Gorsuch says this disconnect -- between what she was told she paid for, and what she actually paid for -- are material misrepresentations (*see id*. at ¶ 106).

This Court draws on "judicial experience and common sense" to determine whether a complaint states a plausible claim for relief. *Ashcroft*, 556 U.S. at 679. Common sense suggests it is at least plausible that, had Gorsuch known of LPI's true terms, she would have rearranged her financial priorities to avoid significant charges unrelated to the costs of insuring against flood risk. *See, e.g.*, *Almanzar v. Select Portfolio Serv., Inc.*, 2015 WL 1359150, at *3 (S.D. Fla. 2015) ("[D]isclosing the end cost of force-placing the insurance cannot insulate the Defendants from claims pertaining to the

9

Defendants' behind the scene activities that drove up the rates borne by unsuspecting borrowers."); *Perryman v. Litton Loan Serv., L.P.*, 2014 WL 4954674, at *15 (N.D. Cal. 2014) ("it still could be the case that [despite warning letters] the overall intent of the Defendants' representations were calculated to misrepresent the nature of the [costs] the lenders would pass along to [borrowers] under the LPI clause"); *Cannon v. Wells Fargo Bank, N.A.*, 2014 WL 324556, at *3 (N.D. Cal. 2014) (same); *see also* Doc. 53 at ¶ 107. And though under the mortgage agreement OneWest could demand greater flood insurance coverage, that does not mean the LPI correspondence was not calculated to deceive Gorsuch.

Although a close call, Gorsuch has adequately alleged predicate acts of mail and wire fraud, and this alone makes out a "pattern" of racketeering activity, relieving this Court of the need to reach the parties' arguments regarding honest-services fraud and extortion. *See Rothstein v. GMAC Mortgage, LLC*, 2013 WL 5437648, at *16 (S.D.N.Y. Sept. 30, 2013) *leave to appeal granted on other grounds*, 2014 WL 1329132, at *2 (S.D.N.Y. Apr. 3, 2014) (applicability of filed rate doctrine) *certificate of appealability granted sub nom. Rothstein v. Balboa Ins. Co.*, 2014 WL 4179879 (2d Cir. June 25, 2014).

**Gorsuch Adequately Alleges an Association-in-Fact RICO Enterprise**

Defendants argue "the only 'association' plaintiff alleges among the defendants is the process by which [LPI] is obtained," which as a matter of law defeats her RICO claim (Doc. 68 at 24).

"[T]he existence of an enterprise is a separate element that must be proved . . . [in addition to] the pattern of racketeering activity, and proof of one does not necessarily establish the other." But the existence of an enterprise can be "inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity . . . . [T]he evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce."

10

*Boyle v. United States*, 556 U.S. 938, 947 (2009) (internal citations, quotation marks, and footnote omitted). "RICO applies both to legitimate enterprises conducted through racketeering operations as well as illegitimate enterprises." *United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir. 1985).

Here, as detailed above and in the Appendix, the Amended Class Action Complaint "delineates the specific roles and relationships of the Defendants, alleges the enterprise functioned at least [four] years, and alleges it functioned for the common purpose of promoting a fraudulent [LPI] plan to generate commissions and related" benefits unmoored from the risks of insuring against floods. *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 794–95 (6th Cir. 2012); *see also* Doc. 53 at ¶¶ 145–56. The enterprise's division of labor is well drawn in the Amended Class Action Complaint.

**Gorsuch Alleges Injury Proximately Caused by the RICO Enterprise**

Defendants argue Gorsuch's failure to voluntarily obtain adequate flood insurance is the proximate cause of the injury she suffered, not Defendants' LPI arrangement. Told of the high-cost of LPI and urged to contact her private insurance agent who could provide less expensive coverage, Gorsuch nonetheless failed to purchase borrower-obtained insurance because she could not afford to pay the $1,200 premium up front (*id.* at ¶ 98).

A RICO plaintiff must allege the defendants' "wrongful conduct was a substantial and foreseeable cause of the injury and [that] the relationship between the wrongful conduct and the injury is logical and not speculative." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 487 (6th Cir. 2013) (internal quotation marks omitted). Gorsuch's injury must be the result of the "pattern of activity," *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 353 (6th Cir. 2008), not the result of each separate predicate act, *Vild v. Visconsi*, 956 F.2d 560, 567 (6th Cir. 1992).

11

Gorsuch claims that when she made the choice to forgo borrower-obtained insurance, she did not know that the alternative she received was significantly more expensive than the foregone borrower-obtained insurance because it reflected noncompetitive insurance rates and included cash and in-kind kickbacks for OneWest (Doc. 53 at ¶¶ 106–07).  Again, it is at least plausible that, had Gorsuch known such a large portion of the added cost of LPI allegedly was pure profit to Defendants and unconnected to the risk of insuring against floods, events would have played out differently.  *See Cannon*, 2014 WL 324556, at *3; *see also* Doc. 53 at ¶ 107.  Fact-based issues like these should not be resolved on a motion to dismiss.  *Cf. Trollinger v. Tyson Foods, Inc*., 370 F.3d 602, 615 (6th Cir. 2004) (stating "traditional proximate-cause problem[s]" like weak causal links "will more often be fodder for a summary-judgment motion under Rule 56 than a motion to dismiss under Rule 12(b)(6)").

**Gorsuch Adequately Alleges Unjust Enrichment as to the Insurer Defendants**

Prior to the February 2015 Complaint Amendment adding the Insurer Defendants as parties, this Court twice held that Gorsuch stated unjust enrichment claims against the Servicer Defendants (*see* Doc. 26 at 7; Doc. 32).  The Insurer Defendants argue they are different from the Servicer Defendants for purposes of unjust-enrichment liability -- Gorsuch never conferred a "direct" benefit on an Insurer Defendant, they say, but instead entered into repayment agreements with OneWest and FFA to cover funds previously advanced on her behalf to pay for LPI.

Gorsuch must plausibly allege that she conferred a benefit upon the Insurer Defendants, the Insurer Defendants knew of this benefit, and it would be unjust to permit the Insurer Defendants to retain that benefit.  *See Hambleton v. R.G. Barry Corp*., 12 Ohio St. 3d 179, 183 (1984).  "The rule of law is that an indirect purchaser cannot assert a common-law claim for . . . unjust enrichment against

12

a defendant without establishing that a benefit had been conferred upon that defendant by the purchaser." *Johnson v. Microsoft Corp.*, 106 Ohio St. 3d 278, 286 (2005).

The Insurer Defendants' "indirect" benefit argument is unpersuasive, because it builds on cases in which a plaintiff purchases a product from a third-party retailer, then attempts to sue the product's manufacturer, despite the absence of any economic transaction connecting plaintiff and manufacturer. *See, e.g.*, *Savett v. Whirlpool Corp.*, 2012 WL 3780451, at *7 (N.D. Ohio 2012) (plaintiff's unjust enrichment claim against Whirlpool Corp., related to washing machine he purchased from retailer Home Depot, failed for lack of direct benefit); *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 684 F. Supp. 2d 942, 952 (N.D. Ohio 2009) (same with respect to purchase through retailer BestBuy); *Johnson*, 106 Ohio St. 3d at 286 (explaining "[t]he facts in this case demonstrate that no economic transaction occurred between Johnson and Microsoft" and did not support an unjust enrichment claim against Microsoft, whose operating system came pre-installed on a computer plaintiff purchased from retailer Gateway). In these cases, the plaintiff attempted to reach far back in a product's distribution chain, using unjust enrichment to sue a defendant-manufacturer with little or no connection to the purchase that allegedly conferred a benefit. Courts reject such theories of liability as too attenuated, and as impermissible end-runs around rules that otherwise bar suit. *See, e.g.*, *Johnson*, 106 Ohio St. 3d at 286 (citing Ohio's refusal to grant indirect purchasers standing to pursue a state-law antitrust cause of action as further reason to deny indirect purchasers standing to bring an unjust enrichment claim).

The Servicer Defendants are nothing like retailers, and the Insurer Defendants are nothing like product manufacturers, who usually "receive[] all of the benefits due from the sale of [their product] when the retailers purchased them." *In re Whirlpool Corp.*, 684 F. Supp. 2d at 953 n.4. The Servicer

Defendants merely advanced funds to the Insurer Defendants on Gorsuch's behalf. The Insurer Defendants used the advanced funds to provide LPI, below-cost insurance-related services, and profit of their own. Only thereafter were cash kickbacks routed to OneWest through IndyMac. Gorsuch bore the costs of benefits retained by the Servicer and Insurer Defendants, in the form of added debt on her loan and under repayment agreements. *See Randleman v. Fid. Nat. Title Ins. Co.*, 465 F. Supp. 2d 812, 825 (N.D. Ohio 2006) (rejecting a similar argument with respect to purchase of title insurance because of allegations showing a "transactional nexus" between plaintiff and defendant); *see also Persaud v. Bank of Am., N.A.*, 2014 WL 4260853, at *14 (S.D. Fla. 2014) ("Defendants' alleged retention of benefits, including inflated premiums, commissions, and service fees, would be inequitable.").

The Insurer Defendants stress that Gorsuch paid the cost of LPI premiums advanced on her behalf only after OneWest had sent the funds to the Insurer Defendants; therefore, Gorsuch "[n]ever made any payments" to the Insurer Defendants, and so did not confer a benefit on these Defendants (Doc. 72 at 14). But whether Gorsuch forwarded the funds to the Insurer Defendants, or OneWest did so on her behalf, the substance of the transaction remains the same: she and borrowers like her were the ultimate source of the premiums directly shared by the Insurer and Servicer Defendants. *See Hamilton v. SunTrust Mortg., Inc*., 6 F. Supp. 3d 1312, 1317 (S.D. Fla. 2014).

**Gorsuch Adequately Alleges Balboa and QBEIC's Role in the Enterprise**

Finally, Balboa and QBEIC contend that Gorsuch fails to allege facts showing either Defendant participated in the enterprise.

Only those defendants who "conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs" face civil liability. 18 U.S.C. § 1962(c). RICO's "participation" element is satisfied through "plausible allegations that each [d]efendant 'participated in the operation or

14

management of the enterprise.'" *FFP Holdings, LLC v. Moeller*, 2014 WL 4322804, at \*7 (N.D. Ohio 2014) (quoting *Ouwinga*, 694 F.3d at 792). "[T]he test is construed broadly," *LSJ Inv. Co. v. O.L.D., Inc.*, 167 F.3d 320, 325 (6th Cir. 1999), and includes claims that a defendant "ma[de] decisions on behalf of the enterprise or . . . knowingly carr[ied] them out," *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008)

The Amended Class Action Complaint alleges Balboa (before June 1, 2011) and QBEIC (after) played the same role in the enterprise during the time each company owned Newport and was a party to the exclusive LPI agreement with OneWest and FFA. That alleged role shows participation in the operation or management of the enterprise.

First, Balboa and QBEIC maintained an exclusive, noncompetitive LPI arrangement with the Servicer Defendants, providing, as a quid pro quo for OneWest's lucrative business, kickbacks and below-cost insurance-servicing activities through their subsidiary Newport. It was reasonably foreseeable that, as a result of that agreement, Newport would send misleading LPI correspondence to borrowers. Second, Balboa and QBEIC used the mails or wires, or caused the mails or wires to be used, to sustain central aspects of the arrangement. Balboa and QBEIC paid a portion of Newport's costs of providing the Servicer Defendants with insurance-servicing activities, sending funds by mail or wire (Doc. 53 at ¶¶ 153, 161). And Newport used the mails or wires to send LPI premiums to Balboa and QBEIC. Absent these reasonably foreseeable transmissions, the arrangement would have ground to a halt -- Borrowers would not have been notified of insurance shortfalls, Newport would have lacked Balboa and QBEIC's support in covering revenue shortfalls from the insurance-servicing activities it performed at a loss, and Balboa and QBEIC would not have shared in LPI premiums, used

15

to provide LPI or purchase LPI from an affiliate with the excess retained as profit for Balboa or QBEIC. *See Rothstein*, 2013 WL 5437648, at \*\*15–17.

Because Gorsuch adequately alleges Balboa and QBEIC's own participation in the enterprise, this Court need not address the parties' successor and vicarious liability arguments.

## CONCLUSION

For these reasons, this Court denies Defendants' Motions to Dismiss (Docs. 68 & 72).

IT IS SO ORDERED.

                                                                    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

May 19, 2015

# Appendix

