## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| DOLORES GORSUCH,<br><br>Plaintiff,<br><br>vs.<br><br>ONEWEST BANK, N.A.; FINANCIAL FREEDOM ACQUISITION, L.L.C.; BALBOA INSURANCE COMPANY; QBE INSURANCE CORPORATION; and NEWPORT MANAGEMENT CORPORATION,<br><br>Defendants. | Civil Case No.:<br>3:14-cv-00152-JZ<br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Dolores Gorsuch ("Plaintiff") files this Second Amended Complaint alleging that she was harmed by the force-placed insurance practices of Defendants OneWest Bank, N.A. ("OneWest"), Financial Freedom Acquisition, L.L.C. ("Financial Freedom Acquisition"), Balboa Insurance Company ("Balboa"), QBE Insurance Corporation ("QBE"), and Newport Management Corporation ("Newport") (collectively, "Defendants").

### NATURE OF THE ACTION

1. Plaintiff is an 83 year old unemployed widow who took a reverse mortgage (the "Reverse Mortgage") that was owned, originated, and/or serviced by OneWest and was secured by her residential property in Toledo, Ohio.

2. After Plaintiff took the Reverse Mortgage, OneWest exploited its authority to force-place insurance in order to reap additional profits in the form of unjustified commissions and other forms of consideration at the expense of Plaintiff. These improper

fees and charges were not legitimately related to the cost of the force-placed insurance or the purposes for which force-placed insurance is purchased – to protect the lender's interest in the property.

3. Defendants force-placed insurance on her property and charged her an expensive premium that Defendants split among themselves.

4. Defendants' conduct caused Plaintiff to default on her mortgage and other financial obligations and to suffer fear, anxiety, mental anguish, severe emotional stress, and other physical harm as she was faced with foreclosure and the adverse financial consequences caused by Defendants' force-placed insurance practices and Defendants' persistent and unwarranted threats of foreclosure.

5. At all relevant times, Defendants have engaged in negligent, abusive, and unfair practices with respect to force-placed insurance.

6. Plaintiff asserts a claim for negligence against Defendants, seeking monetary relief in excess of $75,000 for damages and losses caused by Defendants' conduct in servicing Plaintiff's reverse mortgage without due care, and for likewise instituting their force-placed insurance scheme and threatening foreclosure without regard for her advanced age and health.

## THE PARTIES

A. **Plaintiff**

7. Plaintiff Dolores Gorsuch resides in, and is a citizen of, Ohio. She is eighty-three years old, is a widow and is unemployed.

**B.** **OneWest, Its Subsidiaries, and Affiliated Entities**

8. Defendant OneWest Bank, N.A. is a national bank with its headquarters in Pasadena, California. OneWest Bank conducts business in Ohio and throughout the United States and is the current lender-in-interest and servicer of Plaintiff's mortgage.

9. Defendant Financial Freedom Acquisition, L.L.C. is a Delaware corporation with its principal place of business in Pasadena, California. Financial Freedom Acquisition is a wholly owned subsidiary of OneWest and has been since the inception of OneWest's operations, March 19, 2009.

10. Pursuant to an Asset Purchase Agreement which became effective on March 19, 2009, Financial Freedom Senior Funding Corporation ("Financial Freedom Senior Funding"), a former subsidiary of IndyMac Federal Bank, transferred assets to Financial Freedom Acquisition, including Plaintiff's mortgage loan and/or mortgage loan servicing rights, which had previously been owned and/or serviced by IndyMac Federal Bank and/or Financial Freedom Senior Funding.

11. At all times relevant to this lawsuit, Financial Freedom Acquisition's conduct was approved, authorized, ratified, and/or directly controlled by OneWest.

12. Nonparty Financial Freedom, a division of OneWest Bank, N.A. ("Financial Freedom"), is the reverse mortgage division of OneWest and lists its address as a post-office box in Austin, Texas. It conducts business in Ohio and throughout the United States.

13. On or about July 21, 2011, Financial Freedom Acquisition transferred certain

rights, obligations, and liabilities to Financial Freedom/OneWest Bank, including the mortgage loan and or/mortgage loan servicing rights of Plaintiff which had previously been owned and/or serviced by Financial Freedom Acquisition.

14. Nonparty IndyMac Financial Services, Inc. is a California corporation with its principal place of business in Pasadena, California. At all times relevant to this lawsuit, IndyMac was a licensed insurance producer and a wholly owned subsidiary of OneWest Bank.

15. At all times relevant to this lawsuit, OneWest and/or Financial Freedom Acquisition directly controlled IndyMac's conduct through shared management, and OneWest and Financial Freedom Acquisition used IndyMac as the conduit through which OneWest's exclusive insurers funneled kickbacks and other unearned compensation to OneWest. In return for such kickbacks, OneWest's exclusive insurers secured the right to force-place insurance on OneWest's extensive loan portfolio for significantly inflated and noncompetitive premiums.

## C.  **Insurers and Their Subsidiaries**

16. Defendant Newport Management Corporation is a California corporation with its principal place of business in Irvine, California. It does business nationwide, including in Ohio. Before June 1, 2011, Newport was a wholly-owned subsidiary of Balboa. On or around June 1, 2011, Newport became a wholly-owned subsidiary of QBE First Insurance Agency, Inc. ("QBE First Insurance").

17. At all times relevant to this lawsuit, Newport's conduct was approved,

authorized, ratified, and/or directly controlled by Balboa or QBE related entities.

18. For below-market cost, Newport monitored OneWest's entire mortgage portfolio and performed OneWest's insurance related services including: (i) claims-handling; (ii) record-keeping; (iii) monitoring the status of voluntary insurance to determine if sufficient coverage is in place; (iv) corresponding with borrowers, masquerading as OneWest and/or Financial Freedom Acquisition, to notify them when voluntary coverage was insufficient and when force-placed insurance had been issued on their properties; and (v) securing force-placed insurance when appropriate.

19. Newport possessed liberal access to OneWest's and Financial Freedom Acquisition's electronic data to perform insurance related services and was responsible for regularly updating such electronic data for OneWest and Financial Freedom Acquisition.

20. Newport also acted as intermediary between OneWest and Newport's corporate parents, Balboa, and later, QBE. Newport compiled a monthly report of net premiums collected from OneWest and paid to Newport's corporate parents, calculated the predetermined bogus "commission" on those net premiums, and kicked back the commissions to OneWest's subsidiary, IndyMac, even though IndyMac had rendered no actual services in relation to the procurement of insurance or the payment of insurance premiums.

21. In essence, Newport relieved OneWest Bank and Financial Freedom Acquisition of their responsibility to monitor and perform insurance related functions on

their sizeable mortgage portfolios. In exchange for assuming those extensive responsibilities, Newport and its corporate parents acquired the exclusive right to force insurance on thousands or millions of OneWest customers at significantly inflated premiums without the risk of competition from other insurers.

22. Defendant Balboa Insurance Company is a California corporation with its principal place of business in Irvine, California. Balboa is directly or indirectly wholly-owned by Bank of America Corporation. On or around June 1, 2011, QBE Insurance Group, Ltd ("QBE Insurance Group"), an Australian corporation with its principal place of business in Sydney, Australia, purchased a substantial portion of Balboa's assets, including the lender-placed insurance assets and liabilities of Balboa and its affiliated entities.

23. Until June 1, 2011, Balboa, along with its wholly-owned subsidiary, Meritplan Insurance Company ("Meritplan), had the exclusive and lucrative right to receive premiums for force-placed hazard, flood, and wind insurance on OneWest's loan servicing portfolio without competition from non-Balboa affiliated insurers.

24. Balboa and/or Meritplan acquired such exclusive rights through the mechanics of coextensive and complementary agreements between and/or among Balboa, Newport, OneWest, Financial Freedom Acquisition, and IndyMac. Pursuant to those agreements, Balboa and/or Meritplan received the right to receive noncompetitive and substantially inflated force-placed insurance premiums, Newport undertook insurance monitoring and other servicing for an illusory fee, and OneWest was funneled a predetermined portion of

the premiums collected from struggling borrowers through its wholly-owned subsidiary, Indymac.

25. Defendant QBE Insurance Corporation is a Pennsylvania corporation with its principal place of business in New York, New York that does business nationwide, including in Ohio. QBE is directly or indirectly a wholly-owned subsidiary of QBE Insurance Group.

26. Nonparty QBE Specialty Insurance Company ("QBE Specialty") is a North Dakota corporation with its principal place of business in New York, New York that does business nationwide, including in Ohio. QBE Specialty Insurance Company is a wholly-subsidiary of QBE Insurance Corporation.

27. Nonparty Seattle Specialty Insurance Company, Inc. ("Seattle Specialty") is a Washington corporation with its principal place of business in Irvine, California that does business nationwide, including in Ohio. Seattle Specialty is a wholly-owned subsidiary of QBE Financial Institution Risk Services, Inc.

28. Nonparty Praetorian Insurance Company ("Praetorian") is an Illinois Corporation with its principal place of business in New York, New York. Praetorian is a wholly-owned subsidiary of QBE America's, Inc.

29. Since May 2012, QBE, QBE Specialty, Praetorian Insurance, and Seattle Specialty owned the exclusive and lucrative right to receive premiums for force-placed hazard, flood, and wind insurance on OneWest's loan portfolio without competition from non-QBE Insurance Group affiliated insurers.

30. QBE, QBE Specialty, Praetorian, and Seattle Specialty acquired the exclusive right to receive such insurance premiums from OneWest through an asset purchasing agreement between Bank of America Corporation and QBE Insurance Group on or about June 1, 2011.

31. Moreover, as of June 1, 2011, Newport became a wholly owned subsidiary of QBE and its affiliated entities and the scheme, pattern, or practice previously between and/or among Balboa, OneWest Bank, Financial Freedom Acquisition, and IndyMac smoothly transitioned to a scheme, pattern, or practice between QBE, OneWest, Financial Freedom Acquisition, and IndyMac.

## JURISDICTION AND VENUE

32. This Court has diversity jurisdiction over Plaintiff's negligence claim pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and Plaintiff and Defendants are citizens of different states.

33. This Court has personal jurisdiction over Defendants because Defendants are engaged in systematic and continuous business activities in Ohio, have sufficient minimum contacts in Ohio, and/or otherwise intentionally avail themselves of the Ohio consumer market. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants appropriate under traditional notions of fair play and substantial justice.

34. Venue is proper in this District pursuant to 28 U.S.C. § 1391. Plaintiff resides in this District, the property on which Defendants force-placed insurance is in this

District, Defendants regularly conducts business in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

### A. **Background**

35. As is typical of mortgagees, OneWest requires borrowers to purchase and agree to maintain insurance coverage on their secured property.

36. To ensure that the mortgagee's interest in the secured property is protected, Plaintiff's mortgage loan contract allows the lender or third-party servicer to "force-place insurance" when the homeowner fails to maintain insurance. The amounts disbursed for the procurement of such insurance becomes additional debt secured by the mortgage.

37. Plaintiff's mortgage agreement does not disclose the nature of the kickbacks that force-placed insurance providers funnel to OneWest for providing the insurance. The mortgage agreement does not disclose that this payment will be based upon a percentage of the cost of the premium of the force-placed insurance. Instead, the contracts and related notices misrepresent to Plaintiff that the cost of the force-placed insurance is necessary in order to protect the value of and lender's interest in the secured property.

38. Force-placed insurance policies are almost always more expensive than standard insurance coverage, often by as much as ten times. While the force-placed insurance policy primarily benefits the lender, the excessive cost is passed on to the borrower.

**B.**     <u>The Origination of Plaintiff's Mortgage</u>

39. On or about August 24, 1987, Plaintiff purchased a home located at 4440 Grantley Road, Toledo, Ohio (the "Property") and obtained a mortgage to finance the purchase from Toledo Trust Company ("Initial Mortgage"). Plaintiff paid off her Initial Mortgage in or about 1992.

40. Plaintiff subsequently acquired a home equity loan from KeyBank, Cleveland Loan Services ("KeyBank") secured by a mortgage on the Property. As of November 7, 2007, the balance of that loan was $34,951.77.

41. On or about December 7, 2007, Plaintiff obtained the Reverse Mortgage at issue in this action from Financial Freedom Senior Funding. At the time, Plaintiff's property had a value estimated at $120,000.

42. Under the terms of Mortgage Agreement, Plaintiff could draw upon a line of credit established by Financial Freedom Senior Funding up to an amount known as the "Principal Limit."

43. On December 2, 2007, Plaintiff's initial Principal Limit was $88,920. That amount was reduced, however, to $36,555.05 after closing costs ($6,980.75), a discharge of liens, including the KeyBank home equity loan ($35,762.72), a loan advance to Plaintiff ($5,000), and a servicing fee set-aside ($4,621.48).

44. The servicing fee set aside of $4,621.48 represented an "amount . . . to be applied to payments due for a fixed monthly charge for servicing activities of Lender or its servicer" and was not available for draw by Plaintiff.

45. The terms of the Mortgage Agreement also required the payment of certain property charges, as detailed in paragraphs 2,3, and 5:

> **2. Payment of Property Charges.** Borrower shall pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreements.

> **3. Fire, Flood, and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire. This insurance shall be maintained in the amounts, the extend and for the periods required by Lender or the Secretary of Housing and Urban Development ("Secretary"). Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extend required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to Lender.
>                              *        *        *
> **5. Charges to Borrower and Protection of Lender's Rights in the Property.** . . . If Borrower fails to make these payments or the property charges required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.
> To Protect Lender's security in the Property, Lender shall

advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities as defined in the Loan Agreement. Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

## C.     Defendants' Force-Placed Insurance Operations

46. From March 2009 until at least May 2013, OneWest was a party to an agreement with Balboa, later replaced by QBE, whereby OneWest received "commissions" funneled through its wholly owned subsidiary, IndyMac, from Balboa/QBE's wholly-owned subsidiary, Newport, even though IndyMac performed no insurance-related services for Newport or OneWest.

47. In return, OneWest provided Balboa, QBE, and their affiliates with the unfettered right to collect noncompetitive, inflated premiums from insurance policies force-placed throughout the United States.

48. The excessively inflated price of force-placed insurance provided to Plaintiff did not represent the actual cost of providing the insurance, but instead represented the encompassed fees, commissions, "rebates" or (kickbacks), and other consideration for "faux" services purportedly provided by IndyMac. The inflated price also consisted of a significant mark-up by insurance providers, like Balboa, who took full advantage of Plaintiff's distressed home and Plaintiff's precarious financial condition, old age, and unemployment.

49. For instance, Plaintiff's force-placed insurance policy cost much more than equivalent, market-priced insurance. Defendants' inflated force-placed insurance premium hastened Plaintiff's descent into default and potential foreclosure and caused significant damage to Plaintiff's health and well-being.

50. Defendants' acts in formulating and participating in the above misconduct constituted negligence, violated the duty of cared owed to Plaintiff, and caused damages to Plaintiff, including physical harm and mental stress.

**D.      OneWest Charged Plaintiff for Force-Placed Insurance Pursuant to Lucrative Pre-Arranged Agreements**

51. In or around June 2008, Regan Insurance Agency ("Regan" Insurance"), Plaintiff's homeowner's insurance agent, informed Plaintiff that Financial Freedom Senior Funding required Plaintiff to maintain flood insurance on her home. As a result, Plaintiff purchased the insurance on her own, at a total premium of approximately $600.

52. Approximately six months later, in April 2009, Regan Insurance informed Plaintiff that Financial Freedom Senior Funding was demanding that Plaintiff provide $200 to $300 more for her flood insurance.

53. Plaintiff's individually acquired flood insurance premiums were between approximately $800 and $1,200 per year.

54. Between 2009 and 2012, Financial Freedom Acquisition, Financial Freedom, and OneWest (through Newport) issued Plaintiff negligently drafted notices relating to forced-placed insurance.

**E.    Financial Freedom Acquisition's Negligent Notices**

55.  On or about March 19, 2009, Financial Freedom Acquisition took over the mortgage loan and/or mortgage loan servicing rights of Plaintiff which had previously been owned and/or serviced by Financial Freedom Senior Funding.

56.  On June 22, 2010, Financial Freedom Acquisition (through Newport) issued a notice stating that Plaintiff's flood insurance was inadequate and that if she did not provide proof of adequate insurance Financial Freedom Acquisition would "purchase the **additional** flood insurance (lender-placed insurance) required and charge [Plaintiff] for the cost of the insurance." The notice also stated that "LENDER-PLACED FLOOD INSURANCE MAY BE SIGNIFICANTLY HIGHER THAN THE COST OF INSURANCE PURCHASED THROUGH YOUR OWN AGENT OR COMPANY." *Id*. at 2 (capitalization in original). On July 20, 2010, Financial Freedom Acquisition issued another notice essentially restating the above.

57. Financial Freedom Acquisition's (and Newport's) notices were drafted so poorly that a reasonable borrower would believe they represent that borrowers were responsible for the "the cost of . . . insurance" when, in actuality, borrowers were also charged for the undisclosed "commission" received by OneWest through its wholly owned subsidiary, IndyMac. Financial Freedom Acquisition made no reference to kickbacks or commissions in the notices.

58.  Moreover, the notices were negligently drafted because they failed to disclose, *inter alia*: (1) that OneWest and its affiliates had preexisting agreements with Newport,

14

Balboa, and Meritplan that guaranteed OneWest (through IndyMac) would receive unearned, substantial kickbacks and below market-cost portfolio monitoring; and (2) that the cost of force-placed insurance was "significantly higher" because of an illicit *quid pro quo* arrangement between and/or among OneWest, Financial Freedom Acquisition, IndyMac, Newport, and Balboa whereby OneWest received substantial kickbacks and other unearned consideration in return for giving Balboa, and its wholly owned subsidiary, Meritplan, the exclusive right to receive inflated, noncompetitive force-placed premiums on OneWest's entire loan portfolio.

**F.     OneWest's Negligently Drafted Notices**

59.   On July 21, 2011, OneWest took over Plaintiff's mortgage loan and/or servicing rights to her mortgage, which had previously been serviced by Financial Freedom Acquisition.

60.   On June 12, 2012, OneWest (through Newport) sent Plaintiff a notice stating:

> We must receive evidence of flood insurance within 45 days of the date of this letter. If no correspondence is received, it will be necessary for Financial Freedom to place its own insurance on the above-mentioned property. The cost of this insurance may be significantly higher than an independent insurance policy and will cover only the dwelling . . . . We and/or our affiliates may receive compensation in connection with the insurance coverage described in this letter.

61.   On July 10, 2012, OneWest sent Plaintiff another notice stating:

> [W]e will be required to obtain flood insurance coverage for you . . . . The cost of lender placed insurance is significantly higher than an independent insurance policy and will only cover your dwelling . . . . If we purchase flood insurance on

15

your behalf, the cost of that insurance will be charged to the outstanding balance of your loan, and, if there are insufficient funds in your line of credit, arrangement will have to be made for repayment. We and/or our affiliates may receive compensation in connection with the insurance policy described in this letter.

62. On August 20, 2012, OneWest sent Plaintiff a final notice informing her that it force-placed flood insurance on her Property at a cost of $1,791.39, covering a term of June 5, 2012 until June 5, 2013. The letter also stated, in relevant part, that Plaintiff was "**responsible for the cost of [force-placed] insurance" and that "[t]he cost of this insurance may be significantly more than the cost of insurance you can obtain on your own** . . . . We and/or our affiliates may receive compensation in connection with the insurance policy described in this letter."

63. The August 20, 2012 notice included a breakdown of the cost of the force-placed insurance and notably omitted any reference to the commission received by IndyMac on OneWest Bank's behalf:

| | |
|---|---|
| Insurance Charges | $1,735.00 |
| Policy Fee: | $0.00 |
| Stamping Fee: | $4.34 |
| <u>Surplus Lines Tax</u> | <u>$52.05</u> |
| TOTAL: | $1,791.39 |

*See id.* at 1.

64. The $1,735 amount listed above is later listed as a "premium" in the August 20, 2012 notice under the heading "Evidence of Flood Insurance." *See id.* at 3. No mention of the commission paid to IndyMac is included in this second list.

65. Upon receiving the final OneWest notice, Plaintiff called Financial Freedom or Newport to explain that she was having trouble purchasing her own flood insurance for the entire year in the one lump payment of $1,200. In response, the customer representative informed her that she should either purchase her own flood insurance or Financial Freedom would purchase it for her and she could enter a repayment agreement. The customer representative negligently failed to explain that Plaintiff would be charged for a commission.

66. Around August 2012, due in part to being charged for inflated, noncompetitive insurance premiums that included OneWest's kickbacks, Plaintiff no longer had funds available in her line of credit.

67. Due to the depletion of her line of credit, on September 20, 2012, Plaintiff executed a Repayment Agreement for $1,791.39 with OneWest. Under the terms of that Repayment Agreement, Plaintiff was informed that "(ii) Failure to cure the repayment amount set forth below . . . could result in Financial Freedom [i.e., OneWest] declaring your reverse mortgage loan due and payable. If the default remains unresolved, this may result in the initiation of proceedings to foreclose and ultimately the loss of your home." The repayment agreement also informed Plaintiff that:

> As stated in your reverse mortgage loan documents, you must pay your property charges timely. Your failure to do so has resulted in Financial Freedom advancing funds on your behalf, which must be repaid. The total repayment amount of $1,791.30 is calculated based on the actual disbursement amount of property charges, less any available line of credit balance at the time of the disbursement(s) and any repayments

received to date.

68. Beginning on or around October 2012, as a result of the foregoing repayment agreement, Plaintiff began paying $149.23 per month for the flood insurance force-placed in 2012.

69. Beginning in April, 2013, OneWest Bank (through Newport) essentially repeated the cycle of negligent letters sent in 2012. On April 21, 2013, OneWest Bank sent a notice to Plaintiff warning that her force-placed flood insurance would expire in 45 days. On June 12, 2013, OneWest Bank notified Plaintiff of a second force-placement of flood insurance for $1,790.52, covering a term from June 5, 2013 until June 5, 2014.

70. On June 12, 2014, OneWest notified Plaintiff of a force-placement of flood insurance for $1,790.52, covering a term from June 5, 2014 until June 5, 2015.

71. On September 3, 2014, Plaintiff executed another Repayment Agreement with OneWest Bank. Pursuant to the terms of that Repayment Agreement, Plaintiff must pay $222.43 a month for the cumulative cost of her force-placed insurance for a two-year term starting September 2014 and ending August 2016 (for a total repayment of $5338.19).

72. On June 12, 2015, OneWest notified Plaintiff of a force-placement of flood insurance for $1,815.29, covering a term from June 5, 2015 until June 5, 2016.

73. Finally, in a letter dated February 19, 2015, OneWest notified Plaintiff that her hazard insurance had lapsed. OneWest stated that if Plaintiff did not provide proof of hazard insurance, OneWest would place such insurance on Plaintiff's residence for an estimated annual premium of $1,387. Until 2015, Plaintiff's hazard insurance premiums

never exceeded approximately $600.

74. The notices and repayment agreements issued by OneWest and Financial Freedom Acquisition were drafted without the proper level of care and as a result, a reasonable borrower would misunderstand the following (without limitation):

A. The notices represent that borrowers were responsible for the "the cost of . . . insurance" when, in actuality, borrowers were also charged for the undisclosed "commission" received by OneWest Bank through its wholly owned subsidiary, IndyMac.;

B. The notices failed to disclose that OneWest and its affiliates had preexisting agreements with Newport and QBE that guaranteed OneWest Bank (through IndyMac) would receive unearned kickbacks and below market-cost portfolio monitoring;

C. The notices failed to disclose that the cost of force-placed insurance was "significantly higher" (approximately $600 higher) because of an illicit *quid pro quo* arrangement between and/or among OneWest, QBE, and Newport whereby OneWest Bank received kickbacks and other unearned consideration in return for giving QBE the exclusive right to receive inflated, noncompetitive force-placed premiums on OneWest's entire loan portfolio;

D. The notices speak of "compensation" in amorphous, equivocal terms rather than state definitively that Plaintiff would be financially responsible for a commission paid to IndyMac. This is especially true in the August 20, 2012 notice, where OneWest did not list the "commission" in the two breakdowns of Plaintiff's force-placed insurance expenses;

E. The notices fail to disclose that the "compensation" paid to OneWest, through IndyMac, including portfolio-monitoring below-market cost and rebates or kickbacks that were not in connection with any actual services rendered (and, thus, is not "compensation" but instead is a kickback);

F. The repayment agreements executed by Plaintiff speak only of Plaintiff's failure to pay property charges and fail to mention that the repayment amount also consists of a commission paid to OneWest through its wholly owned

subsidiary, IndyMac.

75. OneWest and Financial Freedom Acquisition continuously issued the foregoing notices and foreclosure warnings beginning in 2009 without reasonable grounds for believing the veracity of the assertions contained in the notices.

76. Such conduct constitutes negligence, violates the applicable standard of care, and caused Plaintiff physical and emotional harm.

**COUNT I**
**NEGLIGENCE**
**(Against all Defendants)**

77. Plaintiff repeats and realleges each and every paragraph above as if set forth in this Count.

78. This action is brought because Defendants devised and carried out a plan to overcharge Plaintiff for force-placed insurance, accelerating her descent into default without proper regard for Plaintiff's health and well-being.

79. Defendants engaged in this conduct negligently by, among other things, issuing Plaintiff notices and foreclosure warnings from 2009 until 2015 without taking the necessary care to explain the charges imposed on Plaintiff and failing to properly advise Plaintiff of the terms and conditions of her Reverse Mortgage and the nature of force-placed insurance.

80. Under Ohio Law, OneWest and Financial Freedom Acquisition were obligated to perform their contract with Plaintiff with requisite skill, care, reasonable expedience, and faithfulness. Moreover, the law imposes a duty upon Defendants to

refrain from active misconduct that injures another.

81.    Defendants' duties to Plaintiff were heightened because they were fully aware of her fragile financial situation and her advanced age.

82.    Defendants' conduct constituted a breach of the foregoing duties.

83.    As a direct and proximate result of the Defendants' negligent conduct, Plaintiff has suffered physical and emotional damages, the exact amount of which is presently unknown, but which will be proven at trial and exceeds $75,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.    Awarding Compensatory damages for physical and emotional injury;

B.    Awarding reasonable attorneys' fees and costs to the full extent permitted by law; and

C.    Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

Dated: July 22, 2015                              Respectfully submitted,

/s/ *Stephen Fearon, Jr.*
Stephen J. Fearon, Jr. (admitted *pro hac vice*)
**SQUITIERI & FEARON, LLP**
32 East 57th Street, 12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553
Email: stephen@sfclasslaw.com

**ZOLL, KRANZ & BORGESS, LLC**
Pamela A. Borgess (0072789)
James G. O'Brien (0088460)
6620 W. Central Ave.
Suite 100
Toledo, OH 43617
Tel: (419) 841-9623
Fax: (419) 841-9717
Email: pamela@zkblaw.com
Email: jim@zkblaw.com

Counsel for Plaintiff

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

/s/ *Stephen J. Fearon, Jr.*
Stephen J. Fearon, Jr.